GULF, C. & S. F. RY. CO. et al., Appellants,

v.

T. A. WHITE et al., Appellees.

No. 14970.

Court of Civil Appeals of Texas.

Dallas.

June 24, 1955.

Rehearing Denied July 22, 1955.

442

Hudson, Keltner & Sarsgard, Luther Hudson and Joe Bruce Cunningham, Fort Worth, H. P. Kucera, City Atty., and Ted P. MacMaster and W. M. Parks, Assts. City Atty., Dallas, for appellants.

A. J. Thuss, Jr., Dallas, for appellees.

YOUNG, Justice.

Articles 1011a–1011g, Vernon's Ann.Civ. St., is here involved; appellee White and numerous other property owners challenging by certiorari to the District Court the Dallas Board of Adjustment grant of permit to appellant Railway Company for extension of a switch track northwardly on its right of way from within a municipal C–1 commercial district to a point within a R–7.5 residential zone. On trial to the court, the Board of Adjustment order approving the extension of sidetrack was reversed, set aside, and annulled; Judge Long making findings of fact and conclusions of law at instance of appellees to effect that said order was an abuse of discretion on part of the named City Body. The Board of Adjustment, City of Dallas, and Railroad Company have duly excepted to and perfected an appeal from such findings and adverse judgment.

The present suit relates to a tract of land to the northeast of Dallas proper (before annexation of the site and surrounding area in 1945) owned by defendant Railway Company and known as the Reinhardt Station and grounds. Antecedent to this litigation but material thereto, the following facts appear without dispute: That the Gulf, Colorado & Santa Fe Railway Company is a Texas Corporation, organized prior to 1866 for the purpose of owning and operating a system of railroad, having been actively and continuously engaged in such business before 1886 and since, down to the present time; that on April 19, 1886 Joseph Jones conveyed to said railroad in fee simple a tract of land; the Reinhardt Station grounds being located on a part of the land described in this deed; that the Company thereafter constructed a line of railroad from Dallas to Paris (its Paris branch), including the "main line" track hereinafter referred to. At time of such construction Dallas was a much smaller City with Reinhardt Station several miles away, where a depot, loading platforms, stock yards, sidetracks, and other facilities had been maintained as early as 1904; defendant Company operating the Station for many years forward as part of its railroad line.[1] Later on, but before 1946, the Reinhardt depot, stock pens and loading platforms were torn down and removed; the switch tracks on each side of the main line remaining as originally located, upon annexation of the station grounds and surrounding area to the City of Dallas by ordinance of May 16, 1945.

The same locality as it appeared at inception of this controversy is shown by the following composite of Exhibits 5 and 24 (see map); which plat is to be given a north-south view. Here it should be noted that the City of Dallas by 1951 comprehensive zoning ordinance placed the area north of Fuller (Fourth) Street in a Residential 7.5 zone, with the section south of Fuller to Peavy Road, inclusive of all lands or lots adjoining the right of way, zoned as C–1 or Commercial; the whole of this map vicinity appearing as residentially zoned except that designated as C–1.

1. In the record appears a map of the "Town of Reinhardt," adopted and filed with the Dallas County Clerk by the Railroad Company on Dec. 24, 1903, showing establishment of a townsite there; extending some 2,300 feet along each side of a 300-foot right of way, with numbered lots and blocks; east and west streets, known as First, Second, Third, and Fourth; north and south public ways labeled as "Avenues."

At the south end of this picture is Peavy Road, an east-west thoroughfare. Going north from there are further east-west streets which, if extended, would cross defendant's right of way, named consecutively Naylor (old First Street), Stevens (Second), Drake (Third), Fuller (Fourth), then Gus Thomasson Road (old Easton). Beginning near Peavy Road are the following sidings on Company right of way located to the west and east of defendant's main line: On the west is track No. 1, running alongside and coming back into the main line near Gus Thomasson Road. There is testimony that siding No. 1 was constructed as a passing track, and in 1905 converted into a team track—for access by teams or trucks. North of Fuller Street is spur track No. 4 leading off from switch track No. 1 and serving Southland Lumber Company, constructed in 1953; and near Peavy Road is spur track No. 3, similarly branching off of switch track No. 1 to Glenn Farris Lumber Company. Coming off the main line to the east is switch track No. 2, now ending south of Fuller but which defendant Railway seeks to extend some 850 feet, placing its terminus north of Fuller and well within the R–7.5 area zoned as residential; and it was for this extension of switch track that the permit in question was granted by defendant Board of Adjustment. Also on Company right of way to the east (established by long public user) is East Zacha Road—a well traveled hard surfaced street, running north and south from Peavy to and crossing Gus Thomasson Road; the rear end of all residential lots in the R–7.5 section are either adjacent to defendant's right of way on the west or Zacha Road on the east; and along the right of way, west side, runs a continuous drainage ditch. The residential lots just mentioned front either on Hermosa Drive on the west or Wood Dale on the east, both streets paralleling this north-south right of way.

In early part of 1954 the Railroad commenced the construction of its 850–foot extension of No. 2 switch track, but was halted by the City Building Inspector for lack of permit. Application by Railroad Superintendent Crill was then made to the named City official and by him denied on the following grounds, as appears on reverse side of the instrument: "The right of way is zoned for R–7.5 single family use and a team track requires a C–1 commercial use. Applicant requests permission to extend this track 850' because on the opposite side of the main line there is an existing nonconforming siding track." On the Railroad appeal to the Dallas Board of Adjustment, and hearing by that Body with witnesses for both applicant and property owners, the Adjustment Board on July 14, 1954 entered an order granting the permit, subject to conditions as here quoted: "It was moved by Mr. Anderson that the requested permit be granted for the reason that from all of the evidence submitted it has been determined that there exists a nonconforming use, which use existed for many years before the property was annexed to the City of Dallas and that the requested application is necessary in view of the public need for such an extension of the said railroad track and that this permit is granted specifically upon the following conditions: That (1) unloading and loading by the railroad or the customers can only be done during the hours from 6 a. m. to 6 p. m. and (2) also that the railroad build proper toilets of masonry construction and sanitary facilities for the use of its employees and use of the customers; (3) that the railroad use reasonable diligence in keeping its premises free and clean of debris and that it will not annoy and blow upon the adjoining property owners. Seconded by Mrs. Kelman and unanimously carried. Approved: /s/ Carl M. Brown, Vice-Chairman."

This is the order which the District Court, after review of the Board of Adjustment proceedings and hearing of further evidence, has determined to be an abuse of discretion on part of that municipal agency; holding explicitly that there was no evidence either before the Board or the court to satisfy some of the requirements necessary to its validity. Such judgment and annulment of permit is attacked by both the Railroad Company and the City of Dallas

444

(Map continued on top of next page)

SKETCH
Showing
STATION GROUNDS and CITY OF
DALLAS ZONING LINE
Reinhardt, Texas
G.C.&S.F. RY. CO.
D.E.Q. Ft. Worth, Texas—Aug. 17, 1954
Scale 1"=100'

TRACK #2

| | |
|---|---|
| Present Length | 1,177.7 |
| Extension | 874.3 |
| Proposed Length | 2,052.0 |
| Reline | 128.0 |
| Reline #10 Turnout | 122.0 |

R-7.5 RESIDENTIAL

FOURTH (FULLER)

STR.

BR. 60-A
SINGLE 2'X1'X36' WOOD BOX
SINGLE 2'X1'X36' WOOD BOX EXT.

SINGLE 2'X1'X40' WOOD BOX

NEW HB #2
+27.3

HB #1
+34.9

CATTLE GUARD
+92.8

TO PARIS

GUS THOMASSON RD.

(on behalf of its Adjustment Board) in separate briefs; defendant Company further adopting the theses and argument advanced by codefendant City for reversal of cause.

Preliminary to a discussion of points, the following parts of the City zoning ordinance should be set forth: "Article 165–24 Board of Adjustment. Section 1. It is the declared purpose of this ordinance that nonconforming uses be eliminated and be required to conform to the regulations prescribed in the preceding articles of this ordinance, having due regard for the property rights of the persons affected when considered in the light of the public welfare and the character of the area surrounding the designated nonconforming use and the conservation and preservation of property. The Board shall, from time to time on its own motion or upon cause presented by interested property owners, inquire into the existence, continuation or maintenance of any nonconforming use within the City. Section 2. Organization. There shall be a Board of Adjustment consisting of five members, or as many as provided by law, appointed by the City Council. It shall have all the powers granted by and be organized and controlled by the provisions of Section 7, Chapter 283 of the Laws of 1927 and any amendments thereto. Section 3. Jurisdiction. When in its judgment, the public convenience and welfare will be substantially served and the appropriate use of the neighboring property will not be substantially or permanently injured, the Board of Adjustment may, in specific cases, after public notice and public hearing, and subject to appropriate conditions and safeguards, authorize the following special exceptions to the regulations herein established. 1. Permit the reconstruction, extension or enlargement of a building occupied by a nonconforming use on the lot occupied by such building provided such reconstruction does not prevent the return of such property to a conforming use. 2. Permit such modification of the height, yard area and parking regulations as may be necessary to secure appropriate development of a parcel of land of such restricted area and shape that it cannot be appropriately developed without such modification. * * * ." Article 165–5: "* * * In an R–1 Single-Family dwelling district no land shall be used and no building shall be erected for or converted to any use other than: 1. A single-family residence. * * * 4. Railway right of way and tracks; passenger station but not including railroad yards, team tracks or storage yards." (Above restrictions likewise apply to areas denominated as 7.5 Residential.) Article 165–21: "Nonconforming Uses. 1. Any use of property that does not conform to the regulations prescribed in the preceding articles of this ordinance and which shall have been in existence prior to September 11, 1929, shall be called a nonconforming use. Any use that may have become nonconforming since that date through amendment to Ordinance No. 2052 and amendments thereto and are not violations thereof shall also be called nonconforming uses."

The Railroad points of appeal (twelve in number) are conveniently narrowed by counsel to the following propositions, broadly stated: (1) That it has owned Reinhardt Station and grounds long prior to municipal annexation and like all Texas Railroad corporations, has the power to condemn right of way for use as sidings or team tracks; and having that power perforce of the general statutes of Texas, no zoning ordinance or restriction by deed, or dedication of an Addition can prevent an identical use for which the property might be condemned; the Dallas ordinance being void in so far as it seeks to restrict the use of right of way for the public purposes of its incorporation; (2) that the trial court has mistakenly construed the Board of Adjustment finding of nonconforming use as being merely the *extension* of such use (City Ordinance Art. *165–24*, sec. 3) *from the west* side of the main line to the east side thereof; whereas said Board of Adjustment, after full investigation, hearing of evidence and personal view, found the entire Reinhardt Station grounds to be a nonconforming use at time of annexation by the City; the case at hand involving a *recog-*

*nition* of nonconforming use rather than an extension of such use; and (3) that part of defendant's right of way which the ordinance has zoned as 7.5 or residential, prohibiting its use for team tracks, is suitable for no other purpose than a railroad use; and such classification of the right of way is, therefore, arbitrary and unreasonable, amounting to a confiscation of its property.

Appellee White and other lot owners meet the foregoing contentions by numerous counter points, in substance: (1) That the Railway Company by appeal to the Board of Adjustment against the adverse ruling of the City Building Inspector and for relief under the current zoning ordinance with respect to permit, participating in Board hearings to extent of necessitating a suit by appellees in District Court as provided by statute, is now estopped to assert that said defendant Company was never in the first place subject to regulation by the City of Dallas under its zoning power; (2) that the Dallas comprehensive zoning ordinance, prohibiting use of railroad right of way in a residential district for "railroad yards, team tracks or storage yards," was a reasonable and lawful regulation, being authorized by Arts. 1011a to 1011g, Vernon's Ann.Civ.St., and must be read in conjunction with other general statutes so as to avoid possible conflict; and when so construed, the named Article permits a municipality to reasonably control and regulate railroad rights of way; defendant Company having acquired no immunity by reason of any general Act relative to the operation of a railroad in the State of Texas; (3) under enabling provisions of 1011a, et seq., the City of Dallas can legally adopt a zoning ordinance which prevents defendant Company from using its right of way within a residential district for team tracks or storage yards; at the same time, permitting use of right of way for passage of locomotives and cars, and for passenger station purposes; (4) the undisputed evidence disclosing that adjoining defendant's right of way in the residential district was a commercial district, permitting team tracks and storage yards; and defendant, claiming right of condemnation under any and all conditions, should locate such railway facilities as team tracks and storage yards within the C–1 District; it not being an unreasonable regulation to exclude such railroad activities from a residential district, and requiring installation in the adjacent commercial district of additional facilities necessitated by any increase of business. (5) Indisputably, the Reinhardt Station grounds are within a commercial district, and therefore in all respects conforming; and further, that the part of defendant's right of way into which it seeks to extend its team track is residentially zoned, with no semblance of a nonconforming use, and the trial court correctly set aside the permit on such basis; however, assuming the existence of a nonconforming use, the trial court rightly annulled the permit for lack of evidence under the ordinance requirement that neighboring property will not be substantially or permanently injured; (6) the trial court did not substitute its judgment for that of the Board of Adjustment; the evidence showing that the Board's determination of grant of permit was without any evidence in support and therefore arbitrary and invalid; (7) with respect to arrangement of the immediate use district, the undisputed evidence showing that the entire station grounds at Reinhardt lay within a commercial district, and the right of way in question in a separated residential district, the ordinance was presumptively reasonable and valid; the Railroad Company presenting no evidence that the City lay-out of use districts as delineated was unreasonable or arbitrary; (8) the Dallas comprehensive zoning ordinance in its regulation of defendant's right of way within a residential district permitting certain railroad uses but excluding others, was a reasonable exercise of its police power; and (9) said ordinance, in its application to defendant's right of way within a residential district, permits a continuation of the use which the railroad is now making of its property; and the fact that the ordinance prohibits additional burdensome commercial uses does not deprive defendant Company of its use of the

property without due process of law, and the trial court correctly so held.

■ We regard as untenable appellees' initial plea of judicial estoppel; in effect that the Railroad Company having successfully maintained before the Board of Adjustment a right to the permit on ground of nonconforming use, it was thereby estopped from asserting in District Court the right to extend switch track No. 2 perforce of general statutes of the State. On appeal of complaining lot owners to the District Court from the unfavorable action of the Board, appellant Railroad raised the issue just mentioned; and appellees concede that upon rejection of permit by the Building Inspector the Company could have filed a separate suit by way of injunction against that official or for Declaratory Judgment, alleging conflict of ordinance with state statutes. Under our liberal rule whereby joinder of actions involving identical subject matter, facts and parties is permitted, appellant would not be precluded from raising such additional issues in a court of general jurisdiction, the instant suit by certiorari being just another civil action. City of San Angelo v. Boehme Bakery, 144 Tex. 281, 190 S.W.2d 67; 1 Tex.Jur., sec. 33, p. 639. After all, there is no serious inconsistency in the railroad's position, now asserted, of inapplicability of the zoning ordinance to its proposed extension of track; but, if mistaken in such premise, that it was still entitled to the permit on basis of a nonconforming use.

From standpoint of the Railroad Company, therefore, the primary question of law here involved boils down to this: Of whether it can build a team track alongside its main line and to the east side thereof on property purchased nearly seventy years ago in fee simple; appellees taking the view, confirmed by the trial court, that the City of Dallas, by virtue of its zoning ordinance, can prohibit such use of Reinhardt Station and grounds. Defendant Company to the contrary argues that the City zoning ordinance, or power of any municipality under its zoning ordinance, is not unlimited or superior to the Constitution and general statutes of the State; that the Railroad Company, a public carrier, has been given by virtue of said Constitution and laws, the power of eminent domain to condemn property for railroad use, inclusive of side tracks, team tracks, etc.; and that a zoning ordinance, when in conflict with said statutes or fundamental law, must yield; otherwise, however, subject to a reasonable application of the police power. In support of the propositions just stated, appellant relies upon the following well recognized principles and constructions of statutes: (1) "The operation of a railroad within its municipal boundaries may be a proper subject of regulation by a municipal corporation. * * * The power must be exercised within its scope, without conflicting with statutory provisions, and without unreasonably invading private rights." 74 C.J.S., Railroads, § 395b, p. 946, Yokley; Zoning Law and Practice, Second Ed., Vol. 1, p. 71. (2) "It is fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state. An ordinance in conflict with a state law of general character and state-wide application is universally held to be invalid. * * * Applying the principle specifically, it has often been held that a municipality cannot lawfully forbid what the legislature has expressly licensed, authorized, permitted or acquired, or authorize what the legislature has expressly forbidden." 37 Am.Jur., sec. 165, pp. 787, 788. (3) That defendant is a duly incorporated and operating railroad corporation with power of eminent domain by delegation from the State of Texas, Arts. 6336 and 6341, V.A.C.S.; (4) and undoubtedly inclusive of the power to condemn for purpose of constructing spur or team tracks at the Reinhardt Station; Arts. 6316a, 6336, 6341, 6509, V.A.C.S.; the same constituting a public use. "No one denies that switch tracks, turnouts, and sidings, designed to facilitate the passage of trains and locomotives, to procure fuel and water or materials for the construction and repair of the roadbed, and to receive and discharge freight or passengers for the general public in safety and expeditiously, and which form an integral part of the main line system, are neces-

sarily public uses." . 18 Am.Jur. 691, sec. 62. (5) Under Art. 10, sec. 2, State Constitution, Vernon's Ann.St., railroads are designated as public highways in which the State has a sovereign interest; and "Where a company is invested with the power of eminent domain and secures property to be devoted to a public use, it is immaterial that title was acquired by a valid purchase or settlement; the rights acquired are protected to the same extent as though the property had been condemned." 18 Am.Jur. 739, sec. 112. (6) "The condemnation of the right of way includes the right to make and maintain such way as is required for a railroad, as well as everything necessary to the construction and operation of the road; * * *; and so long as it does not go beyond the limits of its right of way the company may lay its track or additional tracks on any part thereof * * *." 30 C.J.S., Eminent Domain, § 451c, p. 210. (7) "The right of eminent domain comprehends the power to use, as well as the power to take." State ex rel. Helsel v. Board of Commissioners of Cuyahoga County, Ohio Com.Pl., 79 N.E.2d 698, 704.

Concerning the need for extension of No. 2 switch track, Mr. Crill, Santa Fe Superintendent, testified before the Board of Adjustment that it resulted from increase of industries adjacent to its main line at Reinhardt, "and therefore the railroad would like to further their service by building another track"; in which connection the following extracts of statutes have relevancy: "Every railroad company owning * * * a line of railroad in this State shall have authority and power to construct and operate spur or industrial tracks * * *." Art. 6316a, V.A.C.S. "Every railroad company operating a line of railroad within this State shall provide sufficient tracks, switches, sidings, yards, depots, motive power * * * for receiving and delivering freight * * *." Art. 6490, V.A.C.S. "Railroad corporations shall have the following other rights: * * * 6. To purchase, hold and use all such real estate and other property as may be necessary for the construction and use of its railway, * * * and other accommodations necessary to ac-

complish the objects of its incorporation, * * *." Art. 6341, V.A.C.S. "Any railroad company * * * whenever the Commission shall find it advisable to authorize it to do so, may construct * * * an additional line of road * * * together with all necessary sidings, switches and turnouts * * *." Art. 6534, V.A.C.S.

■■ A like question of law was before the Amarillo Court in Fort Worth & D. C. Ry. Co. v. Ammons, Tex.Civ.App., 215 S.W.2d 407; and although somewhat dissimilar in a factual way, we agree with appellant Company that the principle underlying the judgment in Fort Worth & D. C. Ry. Co. v. Ammons is likewise controlling here; in other words, that the Dallas zoning ordinance was not applicable to defendant's proposed use of its right of way for extension of team track. In the cited case, the Railway Company had entered the City of Lubbock from the southeast to a certain distance, its main line then turning north, at which point a spur track on its fee-owned right of way branched off to the southwest, traversed only part way by rails. A 1941 ordinance of the City had zoned a portion of this right of way having no trackage for C use or residential; and the litigation began when the railroad commenced extension of tracks on its right of way within said C zone. The result in District Court was a permanent injunction against the laying of said tracks; the Appellate Court in its order of reversal going on to say: "In our opinion the appellants were acting within the scope of the powers accorded them under the eminent domain statute in extending their rails upon the strip of land in controversy. There is no evidence that the appellants abused the power given them. As we have seen the authority of the appellants to use the strip is a grant from the state, and the right to locate its line of road on the place of its selection is delegated to the appellants by the state. Railroads, under Article 10, Section 2, of the Texas Constitution, Vernon's Ann.St., are declared public highways. The State of Texas, as a representative of the public, has sovereign interest in railroads, the same as it does in highways

or streets. Under circumstances in which the state has a sovereign interest or general concern and has enacted constitutional and legislative regulations covering these interests, our courts have held that a municipality is prohibited from passing ordinances in conflict with these state regulations. In our opinion that portion of the City of Lubbock's Zoning Ordinance which places the strip in a C or residential zone is in conflict with appellants' authority to select and use the strip as their right of way. (Citing authorities)." We see no distinction in principle between the defendant's duty there, in response to industrial needs, to extend its rails on a right of way spur, and an extension of team track under the facts presented here. In either case, the added facility is necessarily incident to its right to operate a railroad. If above conclusions are sound, we could properly forego a further discussion of points and counter points. However, other matters in controversy are deemed of such consequence as to require disposition.

It was for the Board of Adjustment to "inquire into the existence" of a nonconforming use, Art. 165–24, Zoning Ordinance; and appellant Railroad says that the instant Board finding is in the nature of a "recognition" as such of the entire Reinhardt Station and grounds on adoption of ordinance, rather than an "extension" of pre-existing use as found by the trial court; the distinction being that the nonconforming use as defined in Art. 165–21, Ordinance, cannot be abridged by subsequent ordinance; whereas, an extension of nonconforming use may be denied at discretion of the Board; or permitted, subject to findings of public convenience and that "appropriate use of neighboring property will not be substantially or permanently injured."

The 1951 Zoning Ordinance placed these station grounds North of Fuller Street in a 7.5 or Residential area inclusive of switch track No. 1 which traversed the residential section on the west; the controversy here centering on the nonconforming use of siding No. 1 as a team track (loading and unloading of freight by teams or trucks) prior to zoning. Appellees argue that if the particular siding was ever employed as a team track, such use had been long since abandoned. There was testimony before the Board (Vice Chairman Brown) and the court (witnesses Whiteman and Brady) of an intermittent use throughout the years of siding No. 1 as a team track; thus justifying a similar use of its right of way, east side, for similar purposes as a matter of right. "The general rule is that an increase in volume of business alone is not an expansion of a nonconforming use * * *." "* * * Moreover, the view has been taken that it is not essential that a nonconforming use exercised at the time a zoning ordinance is enacted should have embraced an entire tract in order to entitle an owner to subsequently employ it all for the use. To so hold would be to deprive owners of the use of their property as effectively as if the ordinance had been completely prohibitive of all use. * * *." McQuillin, Municipal Corporations, 3rd Ed., Vol. 8, secs. 25.207, 25.208. 58 Am.Jur., sec. 151, p. 1023. In Kenny v. Kelly, Tex.Civ.App., 254 S.W.2d 535, 539, the right of Kelly to build a spur track on Block 7301, City of San Antonio, which he owned, was challenged by the contention that an amendment to the zoning ordinance changing the property from residential to commercial use was void. The San Antonio Court held the amendatory measure valid, partly on ground that the property in dispute was a nonconforming use; stating in such connection: "There is no showing here that the railway spur would operate to change the use of the block, and as long as it did not do so, Kelly could operate the same by virtue of his right to pursue a nonconforming use upon Block 7301." See also De Felice v. Zoning Board of Appeals, 130 Conn. 156, 32 A.2d 635, 147 A.L.R. 161; Rosenthal v. City of Dallas, Tex.Civ.App., 211 S.W.2d 279. If the Board finding of nonconforming use was with reference to the old Reinhardt Station and townsite (and we incline to such a construction), then the railroad would be authorized to intensify

that use as planned, notwithstanding the prohibition of Art. 165–5 against maintenance of team tracks in a 7.5 or Residential district. City of San Angelo v. Boehme Bakery, supra; or, for that matter, without regard for the limitations of Art. 165–24, authorizing a grant of permit by the Board for extension of a nonconforming use when in its judgment the "appropriate use of the neighboring property will not be substantially or permanently injured." Be this as it may, there was ample evidence in support of the Board finding that a team track use had been made of siding No. 1 long prior to the 1951 Ordinance, constituting a nonconforming use in the area north of Fuller Street; and in our further discussion of points, the applicability of Art. 165–24, Zoning Ordinance, may be assumed.

The trial court has concluded that the grant of permit was an abuse of discretion on part of the Board of Adjustment—a question of law. And the action of such municipal agency in performance of this,

a quasi-judicial duty, "should be presumed by the courts to be valid and correct and that, in order to have such action set aside, the burden rested upon appellants to show by competent evidence in court that the decision of the Board was arbitrary, capricious or an illegal exercise of power * * *." Montgomery v. City of Dallas, Tex.Civ.App., 245 S.W.2d 753, 754.

◼ Numerous findings of fact, made by the district court covering state of the evidence, are vigorously attacked by appellants as inconsistent with the record which includes both the Board transcript and a statement of facts. Though mindful of the weight which should be accorded findings of fact made by a trial judge, yet we are bound by the record if in conflict therewith. Swanson v. Swanson, 148 Tex. 600, 228 S.W.2d 156; Rules Texas Civil Procedure, rules 324, 353, 373.[2]

The court's conclusion of law that "There was no evidence before the Board or the Court to satisfy some of the legal require-

2. Of these findings, No. 17 reads: "There was no evidence before the Board of Adjustment or the Court which shows that track No. 2 was a nonconforming use." The legal implication of this finding is that in order for the Board to legally grant a permit for extension of the nonconforming use, it was necessary for track No. 2, lying entirely south of Fuller Street at present, to be nonconforming. This does not follow. The Board had merely to find, which it did, that defendant's main line and track No. 1 north of Fuller Street and in a residential area was nonconforming, along with its ownership of the entire right of way. Finding No. 18: "All of the evidence before the Board of Adjustment or the Court showed that track No. 2 was wholly within a commercial-1 use district and the extension thereof in the manner requested by defendant Railroad into a 7.5 residential district was prohibited by the terms of the Dallas Comprehensive Zoning Ordinance." The basis for such finding is Zoning Article 165–5 prohibiting team tracks in a 7.5 district and is erroneous in that said Article is to be taken in conjunction with Art. 165–24 permitting the extension of a nonconforming use with limitations. Otherwise, the powers and jurisdiction

of the Board of Adjustment under the latter Article would be rendered nugatory. City of San Angelo v. Boehme Bakery, supra. Finding No. 21: "There was some evidence before the Court, *but none before the Board*, as to the public convenience as to the extension of this track No. 2, which was to the effect that shippers desired to unload carload lots of building materials at Reinhardt in greater amount than is now being afforded." (Emphasis ours.) This finding is directly in conflict with the statement of Mr. Crill to the Board of Adjustment (See transcript of such proceedings in the record). Finding No. 22: "There was no finding by the Board of Adjustment that 'the public convenience and welfare will be substantially served' by the extension of track No. 2 into the residential area." To the contrary of such finding, the Board order of permit expressly mentioned a public need for the extension. And again, court finding No. 23, reciting that there was no evidence before the Board of team track use of siding No. 1 in the 7.5 residential area, is contradicted by the record transcript of Board proceedings. (See statements of Crill and Vice Chairman Brown.)

ments necessary for the Board of Adjustment to make its findings, conclusions and order" is obviously based upon its finding No. 25, viz.: "There was no finding by the Board of Adjustment that the 'appropriate use of the neighboring property will not be substantially or permanently injured' by the extension of track No. 2 into the residential area." Thus the trial court holds directly that there was *no evidence in the record* with regard to the matter just above quoted.

 Appellees had been residents of the vicinity since around 1950. Their complaints of property damage were directed largely to existing train operations, whistle blasts; blocking of crossing, bumping of cars, indecent language of men loading and unloading freight; which conditions, they say, would be worsened by the extension of track. Of all this, the Board of Adjustment was aware through testimony of witnesses, making a personal inspection of the area; observng that Zacha Road, a well traveled thoroughfare, lay between the right of way and homes of adjacent land owners on Wood Dale Drive to the east; track No. 1 having at all times extended along the rear of residences on Hermosa to the west; the Board granting application for extension on conditions named in its order. The zoning ordinance

does not require an express finding by the Board that neighboring property would not be substantially damaged by this extension of switch. In our opinion, the foregoing physical facts, conditions[3] and circumstances add up to at least some evidence on the question of no substantial injury, and thus a finding to such effect may be implied; the generally accepted rule of decision being that where certiorari is invoked to review the action of a Board of Adjustment, their findings on the facts are conclusive, if sustainable under any reasonable view of the record as a whole. McQuillin, Municipal Corporations, 3rd Ed., supra, sec. 25.330; Yokley, 2nd Ed., Secs. 187, 188. See also Freeman v. Board of Adjustment, etc., Tex.Civ.App., 230 S.W.2d 387; Rowton v. Alagood, Tex.Civ. App., 250 S.W.2d 264.

We venture to slightly paraphrase the language of our Supreme Court in the Boehme Bakery case by concluding that, "To establish the illegality of the Board's order (denial or grant of such a permit) would require a very clear showing of abuse of discretion, and this record does not meet that test."

The cause is therefore reversed and rendered in favor of appellants; in particular, that the decision of defendant Board of Adjustment be in all respects affirmed.

---

3. In this connection Mrs. Pietsch of 10513 Wood Dale, testified on cross-examination at the trial: "Q. Mrs. Pietsch, as I understand, your house is located right on the east on East Zacha Drive? A. Yes, sir.

"Q. That is a public road, isn't it? A. Yes, sir.

"Q. And all types of trucks and automobiles have a right and do travel back and forth on that road, do they not? A. Yes, sir, but they are moving; they are not standing still, like those loading trucks are. * * *

"Q. And with your yard backing up

to a public street and a much used public street, there is not going to be very much privacy in the back yard and alley which is up against somebody else's yard, isn't that right? A. Well, I don't know.

"Q. You don't know? A. No, sir, it depends on what is going on in the next yard.

"Q. In other words, what I am trying to get at, some of the lack of privacy that you have got out there, at least, is due to being backed to a public street, is it not? A. No doubt, yes, sir."