United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 19, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-11499

EMPACADORA DE CARNES DE FRESNILLO, S.A. DE C.V.;
BELTEX CORPORATION; DALLAS CROWN, INC.,

Plaintiffs-Appellees,

v.

TIM CURRY, District Attorney Tarrant County
Texas, Et Al.,

Defendants,

TIM CURRY, District Attorney Tarrant County Texas,

Defendant-Appellant.

Appeal from the United States District Court for the
Northern District of Texas, Fort Worth

Before BARKSDALE, BENAVIDES, and OWEN, Circuit Judges.

BENAVIDES, Circuit Judge:

The lone cowboy riding his horse on a Texas trail is a
cinematic icon. Not once in memory did the cowboy eat his horse,[1]
but film is an imperfect mirror for reality.

Texas is home to two of the three slaughterhouses in the

---

[1] Though thieves would occasionally eat the cowboy's horse.
*See, e.g.,* *Seven Men From Now* (Batjac Productions 1956).

United States that process horsemeat for human consumption, with the third operating in Illinois. After several decades of operations, the Texas Attorney General informed them that Texas is one of a handful of states that prohibits their activities. Whether he informed them correctly is the subject of this case.

We VACATE the district court's permanent injunction barring the prosecution of slaughterhouses for processing, selling and transporting horsemeat for human consumption. We hold that Texas Agriculture Code Chapter 149 has not been repealed or preempted by federal law. TEX. AGRIC. CODE ANN. §§ 149.001-.007 (Vernon 2004) ("Chapter 149"). We also find that, as applicable to the parties' activities before us, Chapter 149 does not violate the dormant Commerce Clause.

## I. FACTS AND STANDARD OF REVIEW

The Appellees are three slaughterhouses ("the slaughterhouses") that process and sell horsemeat. While the horse byproducts go to various uses—including animal feed, fertilizer and baseball leathers—a substantial majority of the horsemeat is sold and shipped abroad for human consumption. None of the meat is sold domestically for human consumption.

Both Beltex and Dallas Crown operate slaughterhouses in Texas. Beltex owns a controlling interest in the third Appellee slaughterhouse, Empacadora de Carnes de Fresnillo ("Empacadora"). Empacadora operates in Mexico, but sells and transfers its meat to Beltex in Texas, which then sells it abroad. While Empacadora

2

currently operates in Mexico, it has speculated that it will one day come into Texas to handle distribution, sales, and export matters instead of dealing its product through Beltex. The companies have been marketing horsemeat for human consumption as far back as the mid-1970s, but recently the legality of the practice was called into question.

In 2002, Texas State Representative Tony Goolsby requested that the Texas Attorney General clarify the enforceability of Chapter 149, which on its face prohibits the processing, sale or transfer of horsemeat for human consumption. The Attorney General issued an opinion stating that Chapter 149 was applicable to the slaughterhouses in Texas and was not preempted by federal law.

When the slaughterhouses learned of the opinion, and that Beltex and Dallas Crown were facing imminent prosecution, they brought this case. They sought a declaration of legal rights and responsibilities and to enjoin any potential prosecution against them under Chapter 149. They argue that Chapter 149 has been repealed, is preempted by federal law, and violates the dormant Commerce Clause.

The facts of the case are all stipulated, and both parties filed motions for summary judgment. The district court ruled in favor of the slaughterhouses and permanently enjoined Tarrant County District Attorney Tim Curry ("Curry") from prosecuting the companies under Chapter 149. The court held that Chapter 149 (1) was repealed, (2) was preempted by the Federal Meat Inspection Act,

3

and (3) violated the dormant Commerce Clause.  We disagree as to each point.

While we review a district court's grant or denial of a permanent injunction for an abuse of discretion, *Peaches Entm't Corp. v. Entm't Repertoire Assoc.*, 62 F.3d 690, 693 (5th Cir. 1995), we review all three issues of law supporting the district court's injunction *de novo*.  *Twin City Fire Ins. Co. v. City of Madison*, 309 F.3d 901, 904 (5th Cir. 2002).

## II.  DISCUSSION

Before we can consider potential constitutional infirmities in Chapter 149, we must determine whether it is in force.  If it has been repealed then we need not address the constitutional concerns the statute raises.  *See Elkins v. Moreno*, 435 U.S. 647, 661-62 (1978).  While it is generally preferable to avoid such constitutional issues, courts "cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question."  *United States v. Locke*, 471 U.S. 84, 96 (1985), *quoting Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933).

## A.  REPEAL

It is unchallenged that Chapter 149 prohibits the activities of the slaughterhouses if it is in force.  The statute reads:

A person commits an offense if:

4

    (1) the person sells, offers for sale, or exhibits for sale horsemeat as food for human consumption; or

    (2) the person possesses horsemeat with the intent to sell the horsemeat as food for human consumption.

TEX. AGRIC. CODE ANN. § 149.002. It is also an offense to transfer horsemeat to a person one knows or should know intends to do those prohibited activities. *Id.* at § 149.003. This statute was first enacted in 1949, 1949 Tex. Gen. Laws 78. While this statute was recently codified as Chapter 149 in 1991, the slaughterhouses contend that it was repealed by a provision last codified two years earlier in 1989.

We first find that the Texas Meat and Poultry Inspection Act ("TMPIA") has not implicitly repealed Chapter 149 by way of an irreconcilable conflict. *See* TEX. HEALTH & SAFETY CODE ANN. § 433.033 ("Section 433.033"). Alternatively, even if the statutes are irreconcilable, Chapter 149, as the one more recently codified, is controlling.

### 1. Chapter 149 and Section 433 are not Irreconcilable

Section 433.033, titled "Equine Products," states:

A person may not sell, transport, offer for sale or transportation, or receive for transportation, in intrastate commerce, a carcass, part of a carcass, meat, or **meat food product** of a horse, mule or other equine **unless** the article is plainly and conspicuously marked or labeled or otherwise identified, as required by rule of the commissioner, to show the kind of animal from which the article was derived.

*Id.* (emphases added). The slaughterhouses argue that this

5

implicitly permits the sale of horsemeat for human consumption under certain conditions, and thereby repeals Chapter 149.

Implicit repeals are not favored, but if two acts are in irreconcilable conflict the latter controls. *Jackson v. Stinnett*, 102 F.3d 132, 136 (5th Cir. 1996). Statutes are in irreconcilable conflict only if there is a "positive repugnancy" between the statutes, such that one is eviscerated by the other. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189-90 (1978).

The district court agreed with the slaughterhouses that Section 433.033 recognizes the legality of selling horsemeat for human consumption under certain conditions, and thereby repealed Chapter 149's prohibition of the activity. It made a special note that Section 433.033 applies to "meat food products," which it stressed are defined in the Act as "capable of use as human food." TEX. HEALTH & SAFETY CODE ANN. § 433.003(13). The district court read this to mean that, because horsemeat is "capable for use as human food," it is implicitly legalized for such a purpose. *See* Order Granting Plaintiffs Motion for Summary Judgment at 6 n.5 (Aug. 25, 2005) ("Summary Judgment Order").

The district court misreads Section 433.033. The TMPIA is concerned with meat inspection, labeling, packaging, slaughter, transportation, and various other standards of producing meat. It never purports to legalize for human consumption the meat products covered therein. For instance, the Act places numerous regulations

6

on "livestock," which covers a variety of meats ranging from domestic rabbits to exotic animals. TEX. HEALTH & SAFETY CODE ANN. § 433.003. Under the slaughterhouses' approach to reading the Act, this would implicitly legalize the sale of all exotic animals and domestic rabbits for human consumption, overriding any statute to the contrary.

The better reading is that the TMPIA is indifferent as to which meats are legal for public sale, but provides general regulations that may be applied to those that are. Just as it did not legalize the sale of all exotic animals for human consumption, it does not legalize the sale of horsemeat by repealing Chapter 149's unanmbiguous language to the contrary. It does not reach the high standard of irreconcilability required for an implicit repeal.

Furthermore, that a horse "meat food product" is "capable of use as human food" does not mean the product can be legally sold for human consumption. The Act explicitly defines "capable of use as human food" as "not naturally inedible by humans." *Id.* at § 433.003(2). It does not imply that all edible meats are legal for sale as human food, as evidenced by other provisions in the Act that specifically deal with "meat food products" that are "not intended for use as human food." *See, e.g., id.* at § 433.029(b).[2]

---

[2] One could argue that, because the commissioner is only allowed to inspect slaughterhouses where products are processed for human consumption, *see* TEX. HEALTH & SAFETY CODE ANN. § 433.029, the very inclusion of horsemeat in the TMPIA means that it is being treated as legal for human consumption. There is some merit to

7

Human brains are "not naturally inedible by humans," but that does not mean the TMPIA authorizes roadside vendors to start selling them.

Nobody suggests that horsemeat is naturally inedible by humans, just that Chapter 149 makes it illegal to sell for human consumption. Section 433.033 is reconcilable with Chapter 149 by reading it as applying only to horsemeat used for other legal purposes, such as animal feed.

Chapter 149 prohibits the sale of horsemeat for human consumption. That does not conflict with the regulatory purposes of Section 433.033 or its recognition that horsemeat is "not naturally inedible by humans."

2. *Fleming Foods* and Codification's Effect

that point, but we are convinced otherwise for two reasons.

First, nothing in Section 433.033 suggests that horse slaughterhouses are necessarily open to inspection, as it reads, "The commissioner may require an establishment at which inspection is maintained under this chapter to prepare [equine products] in an establishment separate from one in which livestock other than equines is slaughtered." *Id.* at § 433.033. While this language can be read to suggest that horse slaughterhouses are open to inspection, it can just as easily be read to suggest that the commissioner can require horsemeat be prepared in establishments separate from those where inspection is required. Second, since the language of the statute is ambiguous in this respect, we cannot find an implicit repeal as that requires "irreconcilable conflict." Here, there may be a potential conflict, but it can be reconciled through the plausible reading of the statute given here.

We are also mindful of the fundamental rule of statutory interpretation that "specific provisions trump general provisions." *Navarro-Miranda v. Ashcroft*, 330 F.3d 672, 676 (5th Cir. 2003). A general appeal to the purpose of the TMPIA cannot substitute for a thorough reading of the statute's terms.

8

Even if the statutes are irreconcilable, the latter one controls. *Stinnett*, 102 F.3d at 136. Given Texas's continuing process of codifying its statutes, it is not easy to determine whether Section 433 or Chapter 149 came later. Thankfully that difficult question has already been answered by the Texas Supreme Court in *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278 (1999). We are compelled by that case to find Chapter 149 is controlling as the provision last codified.

By way of background, for the past several decades the Texas Legislative Council has been charged with the task of codifying Texas statutes. TEX. GOV'T CODE § 323. This continuing codification process is meant to clarify and simplify statutes, thereby making them more accessible to the public. *Id.* at § 323.007(a). The council's power is limited, as it "may not alter the sense, meaning, or effect of the statute." *Id.* at § 323.007(b). Codifications are therefore often distinguished from "substantive" enactments.

The statutes at issue here each originated decades ago and each has a rather convoluted history, as the parties discuss at length in their briefs. While Chapter 149 was the one last codified, Section 433 derived from the latter substantive enactment. If these statutes are irreconcilable, do we look toward the most recent substantive enactment or the one last codified?

In *Fleming Foods*, the Texas Supreme Court faced a similar

9

question, asking, "What effect should be given to clear, unambiguous statutes that were drafted by the Legislative Council as part of the codification process but that depart from prior law?" 6 S.W.3d at 283. The court emphasized a need for clarity in finding that "the codifications enacted by the Legislature are the law of this State," and that when "specific provisions of a 'nonsubstantive' codification and the code as a whole are direct, unambiguous, and cannot be reconciled with prior law, the codification . . . must be given effect." *Id.* at 286.

*Fleming Foods* indicates that codifications—even if labeled "nonsubstantive"—are legislative enactments that must be given full effect, and such codifications may repeal and prevail over prior laws.[3] The complicated and convoluted statutory history raised by the parties here demonstrates how difficult it would be to implement a contrary rule.

At oral argument the slaughterhouses suggested that a case from the Texas Court of Criminal Appeals stands for the contrary rule. *Ex Parte Holmes*, 754 S.W.2d 676 (1988). In that case, the

---

[3] This case is distinguishable from *Fleming Foods*, since that case dealt with a conflict between a statute and its own subsequent codification. But the language and rationale of that case provide strong support here, since clarity and ease of interpretation both militate in favor of a simple rule that the statute last codified controls. While the rule that the most recent substantive enactment controls might seem equally easy to apply, it requires much more historical research into a statute's origins and deciphering which provisions of a statute are substantive versus mere nonsubstantive codifications. *Fleming Foods* guides us against such a convoluted method of statutory interpretation.

10

earlier statute controlled over a subsequent nonsubstantive codification. But the later-codified statute there had an explicit provision indicating that it "does not affect the validity" of the earlier statute in question. *Id*. at 685. The court stressed that this was the "most important" basis for its decision, and that the later codification must be read "in light of" that language. *Id.* at 685-86. Chapter 149 contains no similar language indicating that its provisions yield to Section 433, making *Ex Parte Holmes* inapplicable.

Chapter 149 has not been repealed. We now turn our attention to the constitutional concerns the slaughterhouses raise.

B. PREEMPTION

The first constitutional claim the slaughterhouses raise is that Congress, through the Federal Meat Inspection Act ("FMIA"), has preempted legislation that regulates the sale and transport of horsemeat. If true, the state legislation would be void under the Constitution's Supremacy Clause. U.S. CONST. art. VI cl. 2. When addressing preemption claims, "our sole task is to ascertain the intent of Congress." *Cal. Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 280 (1987). "Pre-emption is not to be lightly presumed." *Id.* at 281.

A piece of federal legislation can expressly preempt states from legislating in a particular area. Even if a federal statute does not expressly preempt a piece of legislation, it may do so

11

implicitly by directly conflicting with it or by occupying a field so pervasively as to naturally exclude it. *See Perry v. Mercedes Benz of N. Am., Inc.*, 957 F.2d 1257, 1261 (5th Cir. 1992). We can find no indication that Congress intended to prevent states from regulating the types of meat that can be sold for human consumption. We address express and implied preemption in turn.

1.  Express Preemption

The FMIA contains an express preemption clause, stating that requirements "with respect to premises, facilities and operations of any establishment at which inspection is provided . . . which are in addition to, or different than those made under this chapter may not be imposed by any State." 21 U.S.C. § 678. It further prohibits states from imposing different "[m]arking, labeling, packaging, or ingredient requirements." *Id.*

This preemption clause expressly limits states in their ability to govern meat inspection and labeling requirements. It in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place.[4]

---

[4] As in the TMPIA, the FMIA only states that horsemeat is "capable of use as human food" which applies to any meat unless it is "naturally inedible by humans," denatured, or otherwise identified to deter its use as human food. 21 U.S.C. § 601(j)-(k). It in no way suggests that horsemeat must be legalized for human consumption. This is a less important observation to this analysis than it was to the repeal analysis above, since even if the FMIA implicitly recognizes the legality of selling horsemeat for human consumption, that does not necessarily preclude a state from prohibiting it unless Congress additionally intended to preempt such legislation.

12

We cannot read this as expressly preempting Texas's prohibition on horsemeat for human consumption. With little explanation, the district court found, "Preventing slaughterhouses . . . from selling or possessing horsemeat for human consumption . . . is an attempt by Texas to regulate the premises, facilities and operations of [the] slaughterhouses." Summary Judgment Order at 18. But the FMIA's preemption clause is more naturally read as being concerned with the methods, standards of quality, and packaging that slaughterhouses use, matters Chapter 149 is entirely unconcerned with. Chapter 149 does not infringe upon the territory preserved for the federal government by the FMIA's preemption clause.

The FMIA does not expressly dispose states of the ability to define what meats may be available for slaughter and human consumption. We therefore find that Chapter 149 has not been expressly preempted.

2. Implied Preemption

Even if state legislation is not expressly preempted, it may be implicitly preempted. Implicit preemption is usually divided into two types: field preemption and conflict preemption. Under neither theory did the FMIA preempt Chapter 149.

Congress did not intend to preempt the entire field of meat commerce under the FMIA. Field preemption requires a clear congressional intent. *Guerra*, 479 U.S. at 281. It occurs when a

13

federal statute's scope "indicates that Congress intended federal law to occupy a field exclusively." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

The FMIA specifically indicates that it did not intend to preempt the field of meat commerce entirely, stating that it "shall not preclude any State . . . from making requirements or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter."  21 U.S.C. § 678. Furthermore, the FMIA contains a narrow inspection and labeling preemption clause, and "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992).

The Act's title refers specifically to meat *inspection*, rather than a more comprehensive scheme of meat regulation.  The need for uniform meat packaging, inspection and labeling regulations is strong, lest meat providers be forced to master various separate operating techniques to abide by conflicting state laws.  There is no similar need for uniformity with regard to what types of meat states permit to be sold, especially when considering that horsemeat is only produced for human consumption domestically in Texas and Illinois, and several states have already banned its

14

commercial use for human consumption.[5]

Nor does the FMIA preempt Chapter 149 by conflict. Conflict preemption requires that it would be "physically impossible" for a private party to comply with both federal and state law, or that the law "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005).

It is certainly not physically impossible to comply with the FMIA and Chapter 149. Complying with Chapter 149 by not selling, possessing, or transferring horsemeat for human consumption would not breach any provision in the FMIA. And Chapter 149 does not stand as an obstacle to realizing the FMIA objectives of "assuring that meat and meat food products distributed to [consumers] are wholesome, not adulterated, and properly marked, labeled and packaged." 21 U.S.C. § 602. Chapter 149 prohibits a certain type

---

[5] *See* CAL. PENAL CODE § 598c ("Notwithstanding any other provision of law, it is unlawful for any person to possess, to import into or export from the state, or to sell, buy, give away, hold, or accept any horse with the intent of killing, or having another kill, that horse, if that person knows or should have known that any part of that horse will be used for human consumption."); MISS. CODE ANN. § 75-33-3 ("The term 'food unfit for human consumption' shall be construed to include meat and meat-food products of horses and mules."); 63 OKL. STAT. ANN. § 1-1136 ("It shall be unlawful for any person to sell, offer or exhibit for sale . . . any quantity of horsemeat for human consumption."); *see also 2005-2006 Legislative Review*, 12 ANIMAL L. 277, 281 (2006) (counting five states as having enacted such prohibitive legislation).

of meat from ever getting to consumers, but the slaughterhouses advance no argument that it increases the risk of having adulterated or mislabeled meat reach consumers.

Congress has not demonstrated any intent through the FMIA, expressly or implicitly, to limit legislation like Chapter 149. We agree with the Texas Attorney General and disagree with the district court in finding that Chapter 149 is not preempted.

C.  DORMANT COMMERCE CLAUSE

The final challenge the slaughterhouses raise is that Chapter 149 violates the dormant Commerce Clause. We note at the outset that this case was brought by two slaughterhouses that operate their horsemeat businesses within Texas, and a third that operates in Mexico but transfers and sells horsemeat directly in Texas. This case does not implicate the Foreign Commerce Clause[6] as statutes placing import and export restrictions do, *see, e.g., South Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82 (1984), or in the way restrictions on products "used constantly and exclusively . . . in foreign commerce" would. *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434 (1979). The slaughterhouses here face potential prosecution for sales and activity that take place directly in Texas.

---

[6] The Commerce Clause states, in part, that Congress has the power "[t]o regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8, cl. 3. While it is not a stand-alone clause, this portion of the Commerce Clause is often referred to independently as the Foreign Commerce Clause.

We do not address the potential application of Chapter 149 to an entity that merely transports horsemeat through Texas but engages in no other commercial activity within the State, as Empacadora speculates it may do one day. That hypothetical situation is not before us. While prosecuting such a company would raise unique dormant Commerce Clause concerns—specifically with regard to the Foreign Commerce Clause—none of the slaughterhouses fit that description, nor does there appear to be any company that merely transports horsemeat through Texas.[7]

The United States Constitution's Commerce Clause provides that Congress has the power to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. It is established that this clause also contains a negative component, referred to as the dormant Commerce Clause, that limits the extent to which States can interfere with interstate commerce. This dormant Commerce Clause keeps States from "plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Am. Trucking Ass'n, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005), *citing Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995).

Chapter 149 does not run afoul of the dormant Commerce Clause. It treats both intrastate and interstate trade of horsemeat equally

---

[7] The only American producer of horsemeat for human consumption outside of Texas operates in Illinois. It is not a party to this case and there is no record as to its exportation routes.

17

by way of a blanket prohibition. In no way could the prohibition be considered economic protectionism. The statute does not favor in-state actors over out-of-state actors, as evidenced by the fact that this suit was instituted by two Texas slaughterhouses.

Nonetheless, statutes that do not appear to protect in-state economic interests may still violate the dormant Commerce Clause where the incidental burdens on interstate commerce are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The district court points to a number of burdens Chapter 149 places on interstate commerce, but ignores the fact that the "incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce." *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 502 (5th Cir. 2004) (quotation and citation omitted). Neither the district court nor the slaughterhouses point to a single burden that Chapter 149 places on interstate commerce that does not equally befall intrastate commerce.

Even if we credit the district court's list of incidental burdens Chapter 149 imposes on interstate commerce, then the tolerable burden will depend largely on whether the interests involved "could be promoted as well with a lesser impact on interstate activities." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981), *quoting Pike*, 397 U.S. at 142. Curry argues

18

that the statute advances Texas's interest in (1) preserving horses, (2) preventing the consumption of horsemeat, and (3) preventing horse theft.  The district court responds in turn that (1) horses can still be killed for nonhuman consumption, (2) can still be consumed so long as the meat is not purchased, and (3) horse theft is already being prevented by another statute.  Summary Judgment Order at 13-14.  But the statute does not need to perfectly *fulfill* the identified state interests, it just needs to advance them better than the alternatives.

We are not convinced that removing the significant monetary incentives in the global horsemeat market does not increase the preservation of horses while decreasing the consumption and theft of horses.  The district court's belief that Chapter 149 "does very little, if anything, to preserve horses, prohibit human consumption of horsemeat, or prevent horse theft," *id.* at 13, is unfounded.

The alternative measures the district court suggests are not as effective.  The district court pointed to several other measures that Texas already has in place, including "support[ing] equine research at its agricultural universities," "encourag[ing] the humane treatment of horses," "regulat[ing] and licens[ing] veterinary care for equines," and "legaliz[ing] parimutuel betting on horse races."  *Id.* at 14-15.  The district court concluded that "[t]he fact that Texas does all these things and more provides ample evidence that Texas is able to 'preserve horses' without

severely or significantly burdening interstate commerce." *Id*. at 15.

The district court's reasoning is backward. That Texas takes numerous measures to preserve horses, beside the blanket prohibition, does not lead to the conclusion that those other measures are adequate. A more natural conclusion is that those measures proved inadequate to preserve horses to the extent desired, prompting Texas to enforce the more stringent rule found in Chapter 149. Moving beyond the district court's flawed reasoning, it is a matter of commonsense that the alternatives listed do not preserve horses *as well as* completely prohibiting the sale and transfer of horsemeat for human consumption.

The district court erred in finding that Chapter 149 violates the dormant Commerce Clause. It does not favor local industry, place excessive burdens on out-of-state industry, and no alternative measures could advance Texas's interests as effectively.

### III. CONCLUSION

Chapter 149 is in force and survives the constitutional challenges raised by the slaughterhouses. Absent these obstacles, the slaughterhouses admit they are in violation of Chapter 149. We therefore VACATE the district court's permanent injunction and REMAND with instructions to grant defendant Curry's motion for summary judgment, thereby dissolving the preliminary injunction preventing Curry from prosecuting the slaughterhouses.