# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 1, 2010

No. 08-11200

Lyle W. Cayce
Clerk

TEXAS MIDSTREAM GAS SERVICES LLC,

Plaintiff - Appellant

v.

CITY OF GRAND PRAIRIE; ROB ARD, in his official capacity as Chief
Building Official of the City of Grand Prairie; RON MCCULLER, in his
official capacity as Director of Public Works of the City of Grand Prairie;
ROMIN KHAVARI, in his official capacity as City Engineer of the City of
Grand Prairie; JOE SHERWIN, in his official capacity as Floodplain
Administrator of the City of Grand Prairie,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
No. 3:08-cv-1724-D

Before GARZA, DeMOSS, and CLEMENT, Circuit Judges.

DeMOSS, Circuit Judge:

This appeal concerns municipal regulation of the siting, construction, and
operation of a natural gas compressor station. We weigh jurisdictional and
jurisprudential concerns before addressing the merits, which implicate
federalism and the interplay between state and local authority under Texas law.
We affirm the judgment of the district court denying injunctive relief in part and
granting relief in part.

No. 08-11200

I.

Plaintiff-Appellant Texas Midstream Gas Services LLC ("TMGS") is in the business of installing and operating natural gas pipeline facilities. It is known as a "midstream gas gatherer." Grand Prairie, Texas ("Grand Prairie" or "the City") is a home-rule city.

In 2007, TMGS announced plans to construct a natural gas pipeline and compressor station in Grand Prairie. Compressor stations are needed to clean and compress natural gas after extraction in anticipation of interstate transport. TMGS acquired land for the station and easements for the pipeline. Apparently concerned by the prospect of a compressor station within city limits, the Grand Prairie City Council amended the City's Unified Development Code ("UDC") on July 1, 2008, to cover natural gas compressor stations. GRAND PRAIRIE, TEX., UDC art. 4, § 10 (2008) ("Section 10"). Section 10 requires a Specific Use Permit ("SUP") from the City to build and operate a natural gas compressor station ("the SUP requirement"). *Id*. art. 4, § 10.1. It requires, *inter alia*, that compressor stations comply with setback rules ("the setback requirement"); have an eight-foot security fence ("the security fence requirement"); enclose equipment and sound attenuation structures within a building; conform to certain aesthetic standards; and pave means of vehicular access. *Id*. art. 4, §§ 10.2-.6. Section 10 also prohibits compressor stations from emitting noise in excess of pre-development ambient levels. *Id*. art. 4, § 10.5. Violations are punishable by civil penalties of up to $2,000 per day. GRAND PRAIRIE, TEX., UDC art. 21, § 11 (2008).

TMGS sued Grand Prairie and certain City officials for declaratory and injunctive relief. TMGS averred, *inter alia*, that Section 10 was preempted by the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60101–60137, and that Section 10 impinged on TMGS's state-conferred eminent domain powers. TMGS requested a temporary injunction against enforcement of Section 10 during the pendency

of this case, and a permanent injunction upon its conclusion.[1] After considering undisputed evidence, the district court granted in part and denied in part injunctive relief. The court held that the PSA preempted part of the security fence requirement, but the remainder of Section 10 was lawful and severable. The court thus enjoined only the security fence requirement.

TMGS filed this interlocutory appeal. TMGS challenges the district court's failure to enjoin the setback requirement because it infringes TMGS's eminent domain rights and is preempted by the PSA. TMGS says the preempted parts are not severable from the remainder of Section 10, and therefore, Section 10 must be enjoined in toto.

After filing its notice of appeal, TMGS applied "under protest" for an SUP. Because the compressor station would be in an area zoned agricultural, a 300-foot setback applied. TMGS asked for a 250-foot setback from the south lot line. The City Council granted the exception and issued the SUP on July 7, 2009. The district court has stayed proceedings pending appeal.

## II.

We first note that we have statutory jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1), which confers jurisdiction in the courts of appeal over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions." Grand Prairie does not argue that statutory jurisdiction is absent, but rather, says we lack Article III constitutional jurisdiction because the issuance of an SUP has rendered this appeal moot. Grand Prairie reasons that because the appeal seeks to enjoin Section 10's setback requirement, for which an exception was granted, a ruling on the validity of this part of Section 10 would be an advisory opinion. TMGS counters that the station has not been built and that TMGS could change the station's

---

[1] TMGS also sought via a separate state-court lawsuit to compel City officials to issue the permits necessary to preparing the station site for construction.

No. 08-11200

design and location. Moreover, TMGS still challenges Grand Prairie's authority to enact Section 10, and seeks to enjoin the measure altogether.

A.

Mootness is a jurisdictional matter which can be raised for the first time on appeal. *See Harris v. City of Houston*, 151 F.3d 186, 189 n.4 (5th Cir. 1998). This requirement, the so-called "doctrine of standing set in a time frame," mandates that litigants retain a "personal interest" in a dispute at its inception and throughout the litigation. *Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 (1997)). "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 365 (5th Cir. 2003) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). A claim is moot if "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* (citation omitted).

This appeal is not moot. TMGS has argued from the inception of this action that Grand Prairie lacks authority to regulate the compressor station's siting, construction, or operation. TMGS still seeks declaratory and injunctive relief against enforcement of any part of Section 10. If TMGS had only sought to compel issuance of an SUP with a modified setback, it would arguably lack a "cognizable legal interest" in this appeal. *See id.*; *cf. Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 396 (5th Cir. 2000) ("When a party seeks an injunction to halt a construction project the case may become moot when a substantial portion of that project is completed."). TMGS contends that Grand Prairie's efforts to regulate setbacks and other matters are *per se* illegal. It makes no difference that TMGS has applied for an SUP ("under protest" or otherwise), or that an SUP has issued. These events do not render illusory

4

No. 08-11200

TMGS's effort to kill Section 10 once and for all. The station has not been built, and TMGS could modify its plans in the absence of the setback requirement. Moreover, via Section 10, Grand Prairie asserts regulatory authority pursuant to its police powers. Once the station is operational, TMGS will have to comply with myriad City ordinances, violation of which can subject TMGS to fines of $2,000 per day. These are not trifling concerns. Relief from Section 10 would palpably affect TMGS's operations. *See Karaha Bodas*, 335 F.3d at 365-66. Consequently, it is not "impossible for the court to grant any effectual relief." *See Motient*, 529 F.3d at 537.

Before argument, Grand Prairie filed a brief pursuant to Federal Rule of Appellate Procedure 28(j) to alert us to a new Supreme Court opinion. *See Alvarez v. Smith*, 130 S. Ct. 576 (2009). In *Alvarez*, the Court granted certiorari on "whether Illinois law provides a sufficiently speedy opportunity for an individual, whose car or cash police have seized without a warrant, to contest the lawfulness of the seizure." *Id.* at 578. The plaintiffs were six individuals whose property had been seized. *Id.* at 579. However, prior to the Court addressing the merits, all plaintiffs either received their property or conceded that it was properly confiscated; "there was no longer any dispute about ownership or possession of the relevant property." *Id.* at 580. In light of this, the appeal was an "abstract dispute about the law, unlikely to affect these plaintiffs any more than it affects other Illinois citizens." *Id.* As such, it no longer implicated a constitutionally required "case" or "controversy." *Id.* at 580-81. Grand Prairie asserts that "[u]nder *Alvarez*, the process-based injuries upon which TMGS based its Complaint are in the past, and its claims for prospective injunctive relief are moot." Not so. TMGS does not take issue with the City's procedures or diligence in evaluating an SUP application. TMGS contends that an SUP requirement in general, and the setback requirement in particular, is repugnant to state and federal law. Properly framed, TMGS does not allege a "process-

No. 08-11200

based" grievance, but instead a concrete, ongoing injury in having to shoulder the yoke of Grand Prairie's regulatory burdens. The issuance of an SUP does not change this critical fact. This appeal is not moot.

### B.

We address one more procedural wrinkle before weighing the merits. Perhaps convinced that its mootness argument was a winner, Grand Prairie did not brief the merits of this case. At argument, counsel offered no explanation for this omission. In some instances, this would lead us to conclude that a party had forfeited its opportunity to prevail on the merits. *See, e.g.*, FED. R. APP. P. 28(b) (requiring the appellee's brief to contain, *inter alia*, argument for its contentions); *United States v. Whitfield*, 590 F.3d 325, 370 (5th Cir. 2009). However, we retain discretion to consider matters not briefed, especially when they implicate substantial public interests. *See United States v. Miranda*, 248 F.3d 434, 443-44 (5th Cir. 2001). Additionally, when the derelict party is the appellee, who may rely on a favorable ruling by the trial court, it makes sense to construe the "rule" of forfeiture more leniently. *See Shell Offshore, Inc. v. Director, Office of Worker's Comp. Programs*, 122 F.3d 312, 317 (5th Cir. 1997); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 954 (Fed. Cir. 1997). We can also preserve judicial resources and avoid piecemeal litigation by addressing issues sooner rather than later. *See Shell Offshore*, 122 F.3d at 317.

In this case, it makes sense to proceed to the merits of the dispute. There is a substantial public interest in resolving matters implicating federalism and state law questions. The district court's thorough and well-reasoned opinion also gives us a more than adequate basis for reviewing the merits of Grand Prairie's position. Finally, there is little sense in declining to address the merits and remanding for further proceedings. TMGS sought declaratory and injunctive relief. The district court held that, aside from the security fence requirement, TMGS was unlikely to prevail on the merits. This holding, if affirmed, would

6

No. 08-11200

foreclose most forms of relief TMGS could plausibly seek in the district court. Were we to decline to review the district court's conclusions at this time, we could confront a near-identical appeal down the road. We will exercise our discretion to proceed to the merits of this appeal. However, we emphasize that counsel's amateurish tactical decision to address only Grand Prairie's mootness argument is an egregious lapse in counsel's duty to brief all pertinent issues.

### III.

We review the denial of injunctive relief for an abuse of discretion. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). Questions of law, including whether state law is preempted by federal law, are reviewed de novo. *Nichols*, 532 F.3d at 372; *VRC*, 460 F.3d at 611. If a decision to grant or deny injunctive relief is grounded in legal error, our review is de novo. *Karaha Bodas*, 335 F.3d at 363. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008). If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining requirements. *See VRC*, 460 F.3d at 611 (citations omitted).

### IV.

TMGS first argues that the setback requirement is void under Texas law. TMGS says its eminent domain power "supersedes a setback requirement in a zoning ordinance, unless the objecting party—here, the City—can show that use of the eminent domain power is unreasonable or arbitrary." The district court rejected this position as contrary to Texas law. We affirm.

### A.

7

No. 08-11200

Texas law presumes that zoning ordinances are valid exercises of a city's police powers. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 175-76 (Tex. 1981). A challenger must "prove that the ordinance is arbitrary or unreasonable in that it bears no substantial relationship to the health, safety, morals or general welfare of the community." *Id*. at 176. TMGS does not argue that Grand Prairie's setback requirement is facially invalid. Rather, TMGS insists that, by virtue of its state-conferred eminent domain power, it is immune from the setback requirement unless the City can show TMGS's use of the land is unreasonable or arbitrary.[2] The issue boils down to whether Grand Prairie's zoning power is subservient to TMGS's eminent domain power, or vice-versa.

Several Texas cases explore the interplay between local zoning regulations and eminent domain powers. In the abstract, neither power is unbridled:

> Eminent domain involves the deprivation of the right of the property owner to keep his property when it is needed for public use. Zoning regulations, derived from the police powers, deprive the property owner of the use of his property contrary to standards promulgated for the health, safety and welfare of the public generally. Both powers are inherent in state government and may be delegated for appropriate purposes. Neither power is an unbridled one; in short, there must not be an abuse of the power.

*Porter v. Sw. Pub. Serv. Co.*, 489 S.W.2d 361, 363 (Tex. Civ. App.—Amarillo 1972, writ ref'd n.r.e.) (citing *Lombardo v. City of Dallas*, 73 S.W.2d 475 (Tex. 1934)). The *Porter* court asked "whether on abstract principle a public utility's power of eminent domain is superior to the zoning ordinance of a home-rule city. We hold that it is not . . . ." *Id*. at 362. In that case, homeowners sued Southwestern Public Service Company ("SPS") to remove a substation which violated an Amarillo zoning ordinance. *Id*. at 362-63. SPS argued that, to the

---

[2] "A gas or electric corporation has the right and power to enter on, condemn, and appropriate the land, right-of-way, easement, or other property to any person or corporation." TEX. UTIL. CODE ANN. § 181.004 (Vernon 2010). It is undisputed that TMGS is a gas corporation with eminent domain power.

extent the ordinance conflicted with SPS's eminent domain power, it was unenforceable. The court of appeals disagreed, and held:

> The right of eminent domain advanced here is one derived from a general grant and does not exempt SPS from the zoning authority. The city, to which the state has specifically entrusted the police powers, has the power to inquire into the reasonableness of the manner by which eminent domain is to be exercised within its corporate limits. Its planning ordinances are presumed to be valid until the contrary is shown, and one seeking an exception has the burden of proof.

*Id.* at 365. Similarly, in *Port Arthur Independent School District v. City of Groves* ("*Groves*"), 376 S.W.2d 330, 334 (Tex. 1964), the court held that a school district had to comply with local building codes, notwithstanding its state-conferred mandate to establish and maintain public schools. In the absence of comprehensive statewide regulations for school buildings, a local authority can exercise its police power to promote the public welfare. *Id.* at 334-35.

While cities have discretion in exercising police powers, cities may not bar outright the reasonable exercise of eminent domain powers. In *Austin Independent School District v. City of Sunset Valley* ("*Sunset Valley*"), 502 S.W.2d 670, 671 (Tex. 1973), a city attempted to "prohibit the location of school facilities within its boundaries." The court held that this unreasonably impinged upon the school district's eminent domain power. *Id.* at 672. This was in contrast to *Groves*, which involved a more circumscribed exercise of police powers. *See id.* at 673 ("The enforcement of health and safety regulations is not before the court in the instant case. What is before the court is a zoning ordinance of the City which wholly excludes the school facilities in issue."). Moreover, the *Sunset Valley* court emphasized that the school district could not "act with impunity," namely, it could not build in a given spot if the city showed that the choice of location was unreasonable or arbitrary. *Id.* at 674; *accord Fort Worth & D.C. Ry. Co. v. Ammons*, 215 S.W.2d 407, 410-11 (Tex. Civ.

No. 08-11200

App.—Amarillo 1948, writ ref'd n.r.e.) (holding that city zoning could not stop expansion of railroad siding absent showing that railroad abused eminent domain power, but recognizing that railroad had to comply with city building code); *Gulf, C. & S.F. Ry. Co. v. White*, 281 S.W.2d 441, 450 (Tex. Civ. App.—Dallas 1955, writ ref'd n.r.e.) (same).[3]

When both zoning and eminent domain authority is vested in a city, the city may make reasonable exceptions to zoning ordinances. *See City of Lubbock v. Austin* ("*Lubbock*"), 628 S.W.2d 49, 50 (Tex. 1982). In *Lubbock*, the city condemned a strip of the plaintiff's land in order to improve an intersection, which deprived the lot of the city-mandated ten-foot setback. *Id.* at 49. The plaintiff argued that the city was powerless to take such a measure. *Id.* at 49-50. The court disagreed, holding that "a city exercising its eminent domain power is not bound by its own zoning ordinance unless the objecting party can show that the condemnation is unreasonable or arbitrary." *Id.* at 50.

### B.

We reject TMGS's argument that its eminent domain power trumps the setback requirement of Section 10. Even an eminent domain entity like TMGS must comply with generally applicable zoning requirements. *See Groves*, 376 S.W.2d at 334-35; *Porter*, 489 S.W.2d at 365. TMGS has not shown that Texas intended to exempt it from zoning or setback requirements, or that Texas's regulations have supplanted Grand Prairie's police powers in this field. *See Groves*, 376 S.W.2d at 334-35. Therefore, TMGS's only recourse is to show that Grand Prairie's setback requirement is unreasonable or arbitrary. *See Tippitt*, 616 S.W.2d at 175-76.

---

[3] The eminent domain entity (the railroad) won in both *Ammons* and *White*. However, "neither case expressed the opinion that as an abstract principle the right of eminent domain is superior to the police powers represented by zoning regulations." *Porter*, 489 S.W.2d at 364.

No. 08-11200

TMGS has not attempted to demonstrate that the setback requirement fails to promote public health, safety, or welfare. Instead, TMGS says under *Lubbock*, its "eminent domain power supersedes a setback requirement in a zoning ordinance." It is true that *Lubbock* involved a setback which yielded to the exercise of eminent domain. However, in *Lubbock*, the fact that the city superseded its setback was not legally determinative. Both police power and eminent domain authority were vested by the state in one entity. It would strain logic to suggest that a city cannot make exceptions to its own zoning laws. The *Lubbock* court drew an analogy between the deference accorded a city when legislatively overriding its own ordinance, and the immunity of the state from local ordinances. 628 S.W.2d at 50 (citing *City of Newark v. Univ. of Del.*, 304 A.2d 347, 349 (Del. Ch. 1973)); *see also Sunset Valley*, 502 S.W.2d at 674 (citing *Newark*). Such circumstances are not present in this dispute. Restated, *Lubbock* held that when police and eminent domain powers are vested in a single entity, the entity may make reasonable exceptions to its police power regulations. It is wrong to read *Lubbock* as implicitly abrogating, superseding, or repudiating the principles elucidated and applied in *Porter* and *Groves*, which concern the interplay between non-unitary police power and eminent domain entities. TMGS is unwarranted in concluding that, after *Lubbock*, eminent domain entities are *per se* exempt from setback requirements.

Under Texas law, a city may not unreasonably exercise its police powers to zone out eminent domain authorities altogether. *See Sunset Valley*, 502 S.W.2d at 671-72. However, Grand Prairie's setback requirement manifestly has no such purpose or effect. TMGS suggests that it is unreasonable for zoning requirements to increase the minimum footprint required for an eminent domain project. TMGS relies on *Tenngasco Gas Gathering Co. v. Fischer*, 653 S.W.2d 469 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.), which recognized that eminent domain entities have "the right to determine the location and amount

11

of lands they need to carry out in good faith the business they are chartered to carry on." *Id.* at 476 (citing *Arcola Sugar Mills Co. v. Houston Lighting & Power Co.*, 153 S.W.2d 628, 633 (Tex. Civ. App.—Galveston 1941, writ ref'd w.o.m.)). *Fischer* and *Arcola* were landowner challenges to a condemnation as failing the "public use" requirement. These cases do not forbid a municipality from influencing where an improvement is sited, or how much land is needed to comply with zoning requirements. It may be costly or inconvenient for TMGS to acquire enough land to ensure that its compressor station conforms to Grand Prairie's requirements. But these are normal consequences of complying with local zoning laws. TMGS's insistence that it is exempt from all setback requirements finds no support in law and would unreasonably compromise Grand Prairie's efforts to promote its citizens' health and welfare.

TMGS has not shown that it is exempt from Grand Prairie's zoning regulations or that the setback requirement is unreasonable or arbitrary. TMGS must therefore comply with the regulations, notwithstanding its eminent domain powers. TMGS has failed to show a likelihood of success on the merits, and therefore is not entitled to injunctive relief on this basis.

V.

TMGS next argues that the PSA preempts the setback requirement of Section 10. We hold that the setback requirement is consonant with federal law.

A.

Congress passed the PSA of 1994 to recodify, without substantive change, the Natural Gas Pipeline Safety Act of 1968 ("NGPSA") and the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA"). *See* Pub. L. No. 103-272, 108 Stat. 745, preamble. The PSA is intended to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1). With exceptions not relevant here, the PSA expressly preempts state "safety standards for interstate pipeline facilities or

12

interstate pipeline transportation." *Id.* § 60104(c). The PSA also directs the Secretary of Transportation to "prescribe minimum safety standards" for pipeline installation, operation, and maintenance. *Id.* § 60102(a)(2); *see* 49 C.F.R. §§ 192.1–193.2917, 195.0–195.589. It is undisputed that the regulations cover TMGS's compressor station. Pertinent to this appeal is 49 C.F.R. § 192.163(a), which reads in part:

> [E]ach main compressor building of a compressor station must be located on property under the control of the operator. It must be far enough away from adjacent property, not under the control of the operator, to minimize the possibility of fire being communicated to the compressor building from structures on adjacent property. There must be enough open space around the main compressor building to allow the free movement of fire-fighting equipment.

TMGS says the setback requirement conflicts with this regulation.

Congress may preempt state law in three ways. It may do so by clearly and expressly articulating its desire to preempt an area. *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007). Congress may also preempt state law implicitly by either "directly conflicting with it" (conflict preemption) or by "occupying a field so pervasively as to naturally exclude it" (field preemption). *Id.* Our task is to "ascertain the intent of Congress." *Id.* (quoting *Cal. Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 280 (1987)). Courts presume that "the historic police powers of the States" are not to be curtailed by federal law unless Congress indicates a "clear and manifest purpose" to do so. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.* at 517; *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (noting that, in interpreting scope of preemption, courts must apply a "presumption against the pre-emption of state police power regulations" affecting, *inter alia*, "matters of health and safety")

13

(citations omitted).    Field preemption requires a clear manifestation of congressional intent.  *Curry*, 476 F.3d at 334 (citing *Guerra*, 479 U.S. at 281). Conflict preemption requires that it be "physically impossible" to comply with both federal and state law, or that state law impede "the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (citation omitted).

### B.

The PSA expressly preempts "safety standards" for the facilities at issue. *See* 49 C.F.R. § 60104(c).  Congress has expressly identified the preempted area, so we will not ask if others are implicitly covered.  *See Cipollone*, 505  U.S. at 517; *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) ("Pre-emption fundamentally is a question of congressional intent, *see Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 (1988), and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.").

The question is whether the setback requirement is a "safety standard." It is not.  Along with the other provisions of Section 10, the setback requirement primarily ensures that bulky, unsightly, noisy compressor stations do not mar neighborhood aesthetics.   City Council records reveal that Grand Prairie's primary motivation in adopting Section 10 was to preserve neighborhood visual cohesion, avoiding eyesores or diminished property values.  *See English*, 496 U.S. at 84 (recognizing that motivation behind state law is germane to preemption).  TMGS posits that, regardless of the City's purpose in enacting Section 10, setback requirements affect fire safety.  Because § 192.163 already mandates that compressor stations be situated to minimize fire risks, TMGS says Grand Prairie cannot impose a minimum setback.  We disagree.  A local rule may incidentally affect safety, so long as the effect is not "direct and substantial."  *See id.* at 85; *Schneidewind*, 485 U.S. at 308 ("Of course, every state statute that has some indirect effect on rates and facilities of natural gas companies is not pre-empted.").   Section 10's setback requirement may

incidentally affect fire safety if it requires a *greater* distance between the compressor station and adjacent buildings than would § 192.163 alone. However, this incidental salutary effect on fire safety does not undermine Congress's intent in promulgating the PSA, as it is neither direct nor substantial. *See English*, 496 U.S. at 85.

TMGS counters this inference by asserting that the regulations "address the location of compressor stations." However, the PSA itself only preempts *safety* standards. Section 192.163, an administrative regulation, touches on compressor station location as a means of effectuating this legislative directive. A regulation promulgated by an administrative agency cannot expand the unambiguously expressed preemptive scope set by Congress. *See Cipollone*, 505 U.S. at 517. TMGS says a setback requirement "impedes the achievement of the full purposes and objectives" of the PSA, *i.e.*, conflict preemption applies. But TMGS has not shown that the setback requirement hinders Congress's intent by reducing safety, nor that it is "physically impossible" to comply with Section 10 and § 192.163(a). *See Curry*, 476 F.3d at 334. TMGS raises the prospect that an operator of a compressor station may have to acquire more land to comply with both requirements. This may cost TMGS money, but it does not thwart "the full purposes and objectives of Congress." *See id.*

Our decision today is the first to consider whether the PSA preempts a setback requirement for a compressor station. However, our decision is consistent with PSA preemption jurisprudence from our court and elsewhere. Cases decided under the PSA's predecessor statutes have uniformly invalidated parochial safety provisions. *See ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 472-73 (8th Cir. 1987) (NGPSA) (invalidating state permitting, inspection, and enforcement regime of natural gas pipelines); *Natural Gas Pipeline Co. of Am. v. R.R. Comm'n of Tex.*, 679 F.2d 51, 52-53 (5th Cir. 1982) (NGPSA) (invalidating state legislation protecting against release of

hydrogen sulfide); *United Gas Pipeline Co. v. Terrebonne Parish Police Jury*, 319 F. Supp. 1138, 1140-41 (E.D. La. 1970) (NGPSA) (invalidating ordinance regulating construction, installation, and operation of natural gas pipelines), *aff'd per curiam*, 445 F.2d 301, 302 (5th Cir. 1971); *N. Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261, 1264-65 (D. Minn. 1981) (NGPSA) (invalidating requirement that pipeline be buried at least six feet deep). None of these cases foreclose laws primarily related to aesthetics or non-safety police powers. *See United Gas*, 445 F.2d at 302 ("We do not hold that the Parish Police Jury cannot enact a valid ordinance requiring permits with reasonable conditions."); *cf. ANR Pipeline*, 828 F.2d at 473-74 (evaluating effect of federal preemption on "nonsafety portions" of regime; upholding fees for federally mandated inspections carried out by state agency). Here, Congress has spoken clearly. The PSA preempts safety standards for natural gas pipeline facilities. Grand Prairie's setback requirement is not a safety standard in letter, purpose, or effect. It may remain in force.

Because the setback provision of Section 10 is not preempted, TMGS has not shown it is likely to prevail on the merits. The district court did not abuse its discretion in failing to enjoin the setback requirement.

## VI.

Lastly, TMGS argues that the preempted security fence requirement is not severable from the remainder of Section 10.[4] Consequently, we must strike all of Section 10. TMGS is mistaken.

Severability is matter of state law. *Tex. Pharmacy Ass'n v. Prudential Ins. Co. of Am.*, 105 F.3d 1035, 1039 (5th Cir. 1997). In Texas, if part of a statute is invalid, the remainder survives, unless the invalid provision is "so connected in meaning that it cannot be presumed the legislature would have passed the one

---

[4] Grand Prairie has not appealed the district court's determination that part of the security fence requirement is preempted.

without the other." *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (citation omitted).    Grand Prairie's UDC indicates that all provisions are severable, and if any section, paragraph, sentence, clause, or phrase is decreed unconstitutional, such shall not cause any other part of the UDC to become inoperative.  GRAND PRAIRIE, TEX., UDC art. 1, § 9.  Plainly, it is the intent of Grand Prairie that invalidation of one provision, the security fence requirement, shall not cause a court to throw out the baby with the bath water.  Moreover, the remaining portions of Section 10 are capable of being applied separately, and these distinct provisions (governing, *inter alia*, building materials, roofing, noise levels, and landscaping) are not so closely tied to the security fence requirement that we can presume that, without it, the City would have given up on the whole enterprise.  *Cf. Rose,* 801 S.W.2d at 844.

## VII.

TMGS has failed to show that Grand Prairie's setback requirement is contrary to state or federal law.  Because Grand Prairie has failed to show a likelihood of success on the merits, the district court properly denied injunctive relief with regard to this requirement.  The judgment is AFFIRMED, and the case REMANDED for further proceedings as necessary.