# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 2, 2025

Lyle W. Cayce
Clerk

No. 23-50928

Crystal Clear Special Utility District

*Plaintiff—Appellee,*

*versus*

Kathleen Jackson, *Commissioner, in her official capacity as Commissioner of the Public Utility Commission of Texas;*

*Defendant,*

HK Baugh Ranch, LLC

*Intervenor—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-878

_____

Before King, Stewart, and Higginson, *Circuit Judges.*
Stephen A. Higginson, *Circuit Judge*:

This dispute concerns water provision in Texas pursuant to the Texas Water Code and federal statutory protection given to utility districts indebted to the United States Department of Agriculture.

No. 23-50928

Real estate developer and Intervenor-Appellant HK Baugh Ranch, LLC ("HK Baugh") petitioned the Texas Public Utility Commission ("PUC") to release its undeveloped land, River Bend Ranch, from the certificate of convenience and necessity ("CCN") issued to Plaintiff-Appellee Crystal Clear Special Utility District ("Crystal Clear"). After PUC staff members recommended decertifying River Bend Ranch, but before the PUC issued a decertification order, Crystal Clear sued the PUC's Chair and Commissioners, in their official capacities, in federal court. Crystal Clear alleged that Texas Water Code § 13.2541—which provides for decertification—was preempted by 7 U.S.C. § 1926(b), which affords protection to certain federally indebted utilities providers for the "service provided or made available" while their loans are outstanding.

The district court issued a preliminary injunction enjoining the PUC from decertifying River Bend Ranch or otherwise curtailing the CCN at issue in this dispute. Applying the "physical ability" test announced in *Green Valley Special Utility District v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) (en banc), the district court held that Crystal Clear likely made its service available to HK Baugh and was thus entitled to the protections of § 1926(b). The district court resolved the remaining preliminary injunction factors by concluding that § 1926(b) likely expressly preempts Texas Water Code § 13.2541.

We hold that the district court did not err by concluding that Crystal Clear will likely satisfy *Green Valley*'s "physical ability" test. However, the district court erred to the extent it held that § 1926(b) *expressly* preempts Texas Water Code § 13.2541. Because correct and developed analysis is necessary to resolve an unanswered but important question of law, we REMAND this case to the district court to determine, in the first instance, whether § 1926(b) otherwise preempts Texas Water Code § 13.2541, and, if appropriate, to address all preliminary injunction factors.

No. 23-50928

I

A

This case concerns the provision of water in Hays County, Texas. HK Baugh owns 668 acres of undeveloped land in Hays County that it intends to transform into a mixed-use, master-planned residential community named River Bend Ranch. Plaintiff-Appellee Crystal Clear is a federally indebted[1] special utility district that supplies water pursuant to a CCN issued by the PUC. Under Texas law, a CCN "grant[s] the utility the exclusive right to provide water service in a designated geographic area." *Dobbin*, 108 F.4th at 323 (citing Tex. Water Code §§ 13.242, 13.244). Crystal Clear's CCN encompasses River Bend Ranch.

On January 29, 2019, Crystal Clear and HK Baugh's predecessor in interest, real estate developer B&B Family Partnership, Ltd. ("B&B"),

---

[1] "Enacted in 1961, the Consolidated Farm and Rural Development Act authorizes the [United States] Department of Agriculture to 'make or insure' loans to rural water and sewer utilities." *Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 323 (5th Cir. 2024) (citing 7 U.S.C. § 1926(a)). The federal debt protection provided by § 1926(b) serves two congressional purposes: (1) encouraging rural water development by expanding the number of potential users of such systems, thus decreasing per-user cost, and (2) safeguarding the viability and financial security of rural water providers to ensure repayment of the United States Department of Agriculture's loans. *City of Madison v. Bear Creek Water Ass'n*, 816 F.2d 1057, 1060 (5th Cir. 1987). Accordingly, local governments may not encroach on services provided by a federally protected water association, "be that encroachment in the form of competing franchises, new or additional permit requirements, or similar means," such as condemnation of the association's facilities. *See id.* at 1059 (interpreting § 1926(b) to prohibit "read[ing] a loophole" into its "absolute prohibition"). As we have explained, it would "undermine Congress's purpose" "to allow expanding municipalities to 'skim the cream' by annexing and condemning those parts of a water association with the highest population density." *Id.* at 1060.

In 2012, the United States Department of Agriculture loaned Crystal Clear $3,200,000, with which it "ma[de] improvements to [its] water system and water lines." According to Crystal Clear, this debt "will remain outstanding for multiple years into the future."

entered into a "Non-Standard Service Agreement" ("NSSA") whereby Crystal Clear promised to supply River Bend Ranch 2,000 living unit equivalents ("LUEs") of water. Because Crystal Clear could not fulfill this request without upgrading its infrastructure, the NSSA provided that a "[w]ater [s]ystem [e]xtension shall be designed and constructed to provide non-standard water utility service to [River Bend Ranch]." B&B agreed to pay "all costs associated with the [w]ater [s]ystem modifications," including "engineering" and "construction," while Crystal Clear, for its part, promised to remit to B&B a "[c]onnection [f]ee" paid by builders or other customers within River Bend Ranch.

Before the parties entered into the NSSA, an engineering services firm named M&S Engineering planned and priced the water system extension. In a report dated January 17, 2019, M&S Engineering explained that the River Bend Ranch "development would increase the number of meter connections in the [Crystal Clear] water system by approximately one-third; therefore, major system improvements are to be expected." Notably, M&S Engineering "recommended that a new elevated storage tank" should be "built on-site within the [River Bend Ranch] development . . . ." M&S Engineering also cautioned that although "part of the system is currently supplied by the Canyon Regional Water Authority (CRWA) Hays-Caldwell Water Treatment Plant[,]" additional water sources would, in time, prove necessary because the plant was "almost 100 percent utilized[.]" To that end, M&S Engineering earmarked two additional sources of water for River Bend Ranch: Lake Dunlap and the Edwards Aquifer.[2] Excluding "costs related to easements, land acquisition, permitting, plan review, inspection,

_____

[2] CRWA controls the Lake Dunlap sources while Crystal Clear controls the Edwards Aquifer sources recommended for supplementing the Hays-Caldwell source.

or other administrative costs[,]" M&S Engineering's "preliminary" estimate for the water system extension totaled $2,036,600.

The parties incorporated M&S Engineering's January 17 report into the NSSA, such that, "[i]n the absence of a necessary term or in the event of conflict with any provision in this general [a]greement, the terms in [the report] shall control." That said, the NSSA did not bind the parties to the concept proposed in the January 17 report. Instead, "[a]fter completion of the plans and specifications by [B&B's] and [Crystal Clear's] consulting engineers and their approval by [Crystal Clear's] consulting engineer, the plans and specifications shall become part of this Agreement by reference and shall more particularly define 'the [w]ater [s]ystem [e]xtension.'"

Nor did the NSSA bind the parties to M&S Engineering's exact estimated total cost. Rather than enshrining the projection of $2,036,000, which was "good only for . . . the date the quotations and [w]ater [s]ystem [e]xtension [p]lans were presented to and approved by [Crystal Clear's] [b]oard of [d]irectors[,]" the NSSA stated that the cost of "materials and supplies for construction may include an adjustment to reflect current market prices if such changes are found reasonable and approved in writing by [Crystal Clear's] consulting engineer." The NSSA allocated "[a]ll costs of change orders or other modifications of the engineered design" to B&B "unless such changes or modifications are made at [Crystal Clear's] request for the sole benefit of other [Crystal Clear] customers."

B

HK Baugh altered the original service request multiple times, over several years, resulting in various amendments to M&S Engineering's January 19 report.

HK Baugh first altered the original service request in March 2019. With this revision, HK Baugh asked Crystal Clear to supply a separate

development named Redwood and, moreover, provide 200 additional LUEs to River Bend Ranch. In a report dated May 16, 2019, M&S Engineering estimated that "provid[ing] domestic service for 1,800 [LUEs] as part of [Redwood] and 2,200 [LUEs] for [River Bend Ranch] for a total of 4,000 proposed [LUEs]" would cost "approximately $5,043,000." But according to the testimony of Crystal Clear's General Manager, Regina Franke, HK Baugh did not "give the green light" to proceed with M&S Engineering's proposal and so construction of the water system extension never commenced.

The project remained at a standstill until January 2021. That month, with the NSSA set to expire, HK Baugh paid Crystal Clear $50,000 to extend the agreement through January 25, 2023. Shortly after extending the NSSA, HK Baugh revised its request yet again, "asking [Crystal Clear] for service capacity to meet demands for 4,190 LUEs"—an increase of 190 LUEs. In a report dated May 12, 2021, M&S Engineering reiterated that the "Hays-Caldwell water source is almost 100% utilized." This time, however, M&S Engineering did not propose additional water sources controlled by CRWA and Crystal Clear. Rather, M&S Engineering stated that "Crystal Clear will have additional supply (sufficient for the full buildout of the developments) available from the Alliance Regional Water Authority (ARWA) in June 2023." According to M&S Engineering, Crystal Clear could, in the meantime, provide "additional water available (but not currently used) from [Crystal Clear's] McDonald Well through the Staples Plant." But M&S Engineering warned that "[t]he plant is currently offline and developer contributions to bring the plant back into service would be required to provide water before the addition of the ARWA water supply." In total, M&S Engineering estimated that HK Baugh's request would cost "approximately $6,645,000."

HK Baugh altered its water service request for the final time in January 2022. With this revision, HK Baugh removed Redwood altogether and decreased the River Bend Ranch LUEs from 2,220 to 1,800.

M&S Engineering evaluated HK Baugh's request in a report dated February 17, 2022. Certain details are salient. First, M&S Engineering reminded HK Baugh that "a new elevated storage tank must be added to the pressure zone to provide for the elevated storage and pressure needs of the [River Bend Ranch]." Second, M&S Engineering reiterated that the "Hays-Caldwell water source is approaching 100% utilization[,]" but, unlike before, noted that obtaining water from the sole additional source—ARWA—would now require "[a] ground storage tank" at HK Baugh's expense. Third, M&S Engineering stated that although "[t]he first 450 LUEs can be served by [Crystal Clear] before any off-site infrastructure improvements are needed[,] [a]ny LUEs beyond 450 will require all the recommended infrastructure improvements[.]" Fourth, M&S Engineering proposed a six-part "phasing schedule" in an effort to ensure that the construction of River Bend Ranch did not outpace the availability of water; M&S Engineering suggested that the first phase of development commence in "Q4 2022" and the last in "Q1 2026." And finally, M&S Engineering concluded that "[t]he total cost of the recommended improvements is approximately $4,609,000"—a "preliminary" estimate, "valid for 90 days[,]" that excluded "engineering design services, any easement/land acquisition, permitting, construction inspection or administrative costs associated with the improvements."

HK Baugh responded to M&S Engineering's report in June 2022. "[I]n an attempt to cut construction cost down," HK Baugh asked whether it could build the elevated storage tank on River Bend Ranch instead of M&S Engineering's "preferred" site. M&S Engineering informed HK Baugh that constructing the elevated storage tank on River Bend Ranch would result in various "[a]dditional costs[.]" Later that year, in October 2022, M&S

Engineering clarified the price difference by providing HK Baugh with a "[c]ost [c]omparison" for the elevated storage tank. Per M&S Engineering's estimate, constructing the elevated storage tank on River Bend Ranch would cost $4,465,000 or $4,447,000, depending on its exact location, compared with $1,880,000 if HK Baugh consented to M&S Engineering's preferred site. According to Franke, Paul Kuo—HK Baugh's Manager—said he would "think about things" and "get back with [Crystal Clear]" but ultimately failed to do so.

C

All the while, HK Baugh paired its noncommittal consideration of M&S Engineering's reports with what it now calls an "investig[ation]" into "alternatives" to Crystal Clear.

Most significantly, HK Baugh entered into a "Development Agreement" with the City of San Marcos, Texas—a municipality that provides water service—effective December 7, 2021. The Development Agreement, which covered River Bend Ranch and a separate plot of undeveloped land (together, "Property"), was "intended to create a program for annexation of the Property by the City," and, in particular, to "establish certain restrictions and commitments imposed and made by the Parties in connection with the development of the Property . . . ."

With respect to water service, the Development Agreement acknowledged that River Bend Ranch was "located within the [CCN] held by [Crystal Clear]." But the Development Agreement provided for River Bend Ranch to "receive water service from [Crystal Clear] *unless* water service is requested from the City" in the manner prescribed by a separate

"[u]tility [a]greement" (emphasis added).[3]  In stark contrast to Crystal Clear, the City of San Marcos "confirm[ed]" in the Development Agreement that its "*existing* wastewater treatment plant facilities have sufficient capacity to serve [River Bend Ranch] at full build-out" (emphasis added), making it a cheaper option for HK Baugh.

## D

With construction of the water system extension still paused, the latent conflict between HK Baugh's NSSA with Crystal Clear, and its Development Agreement with the City of San Marcos, came to a head in January 2023.

Shortly before the NSSA's expiration date—January 25, 2023— Franke informed Kuo that Crystal Clear "has not received any recent communication regarding this NSSA/project."  In a response dated January 24, Kuo stated that after "HK Baugh paid [Crystal Clear] $50,000 to reserve the LUE's from the CRWA Hays-Caldwell water supply . . . [Crystal Clear] attempted to unilaterally alter the terms of the executed NSSA by changing the water supply source to ARWA."  According to Kuo, "[t]he resulting development costs to HK Baugh more than quadrupled from the executed NSSA."  Franke replied several hours later.  In addition to "clarif[ying]" that the NSSA renewal fee "was not for the purpose of reserving LUEs from the CRWA Hays-Caldwell water supply[,]" Franke surmised that HK Baugh was "not interested in negotiating an extension of the NSSA and intend[ed] to let the agreement expire."

That same day, HK Baugh petitioned the PUC for expedited release

_____

[3] The "separate utility agreement" is not part of the record on appeal.  However, at the preliminary injunction hearing, counsel for HK Baugh represented that the City of San Marcos will supply water "once the PUC releases the River Bend Ranch . . . [a]ssuming it does."

of River Bend Ranch[4] from Crystal Clear's CCN. To do so, HK Baugh invoked Texas Water Code § 13.2541(b), which provides for "the owner of a tract of land that is at least 25 acres and that is not receiving water or sewer service" to "petition for expedited release of the area from a certificate of public convenience and necessity" under certain conditions. As HK Baugh alleged in its petition, "neither the 548.453 acres for which CCN release is being sought, nor any part or portion of such acreage, currently receives water service from [Crystal Clear] or any other provider."

On June 5, 2023, after Crystal Clear intervened in the PUC proceedings and moved to dismiss HK Baugh's petition for release, PUC Staff filed a "recommendation on final disposition" to the administrative law judge ("ALJ") presiding over the dispute.[5] Because "there are no facilities located on the requested release area and there is no indication that any of the adjacent facilities or those in close proximity are committed to providing service to the requested release area[,]" PUC Staff reasoned that "there is no basis to conclude that the requested release area is receiving service from these facilities in [Crystal Clear's] general service area." Accordingly, PUC Staff "recommend[ed] that the petition for streamlined expedited release be approved."

On June 22, 2023, the ALJ sent a proposed order to the PUC for final disposition. Consistent with PUC Staff's recommendation, the ALJ found that River Bend Ranch "is not receiving actual water service from [Crystal Clear] or any other water service provider[,]" adding that although Crystal

---

[4] HK Baugh did not seek to release the entire 668 acres.

[5] In expedited release proceedings, the PUC "base[s] its decision on the filings submitted by the current CCN holder, the landowner, and commission staff." Tex. Admin. Code § 24.245(f)(11). We take judicial notice of the procedural history in PUC docket 54591. *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) ("Judicial notice may be taken of matters of public record.").

Clear "has plans to bring an additional water source into the general area within which the tract of land is located," it "has not committed or dedicated any facilities or lines to the tract of land for water service." For these reasons, the ALJ—like the PUC Staff—recommended that the PUC "release[] [River Bend Ranch] from [Crystal Clear's] certificated service area . . . ."

Counsel for the PUC reviewed the ALJ's proposed order on July 25, 2023, in advance of a "final order" scheduled for the Commission's "consideration and action" the following week. Notwithstanding Crystal Clear's substantive objections,[6] Counsel's memorandum to the PUC proposed only minor edits, none of which altered the ALJ's recommendation.

E

On July 27, 2023—*after* Counsel for the PUC endorsed the ALJ's recommendation but *before* the PUC issued its final order—Crystal Clear sued the PUC's Chair and Commissioners (together, "PUC Officials"), in their official capacities, in the Western District of Texas.

Crystal Clear alleged that "the conduct of the PUC Officials . . . deprived" Crystal Clear "of its right to non-encroachment, non-curtailment, and non-limitation under 7 U.S.C. § 1926(b)[.]" Under § 1926(b), the water service "provided or made available" through a federally indebted association, such as Crystal Clear, "shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any

_____

[6] Crystal Clear opposed HK Baugh's petition on two grounds. First, that River Bend Ranch "receives water service from Crystal Clear under any interpretation or application of the term 'service'" as defined by the Texas Water Code. And second, that the PUC "must deny or dismiss the [p]etition because removal of [River Bend Ranch] from Crystal Clear's [CCN] is not permitted under [7 U.S.C. § 1926]."

private franchise for similar service within such area during the term of such loan . . . ." According to Crystal Clear, § 1926(b) "preempts any conflicting state law and must be enforced pursuant to the Supremacy Clause of the United States Constitution." However, as Crystal Clear observed in its complaint, Texas Water Code § 13.2541(d) instructs the PUC that it "may *not* deny the petition based on the fact that the certificate holder is a borrower under a federal loan program" (emphasis added). Contending that its "certificated service area is entitled to protection from curtailment or limitation under [§ 1926(b),]" Crystal Clear alleged the PUC Officials to be "engaging in such deprivation of rights secured by federal law under color of state law by way of their adherence to Texas Water Code section 13.2541(d)" and, moreover, "by awarding relief under Texas Water Code section 13.2541."

To that end, Crystal Clear sought various forms of relief during proceedings below. First, "[p]reliminary injunctive relief against the PUC Officials' grant of HK Baugh's petition for expedited release of its property from [Crystal Clear's] certificated water service areas." Second, "[p]ermanent injunctive relief prohibiting [the PUC Officials] from complying, following, or otherwise enforcing Texas Water Code section 13.2541(d)" or "from decertifying the HK Baugh tract pursuant to Texas Water Code section 13.2541, so long as [Crystal Clear's] [f]ederal [l]oan remains outstanding[.]" And finally, a declaratory judgment that Texas Water Code § 13.2541(d) is "unconstitutional" and, more specifically, that decertification of River Bend Ranch "in reliance on [§ 13.2541(d)] would violate the United States Constitution and laws as long as [Crystal Clear's] [f]ederal [l]oan remains outstanding."

On August 8, 2023—after the district court issued a temporary restraining order preventing the PUC from "acting upon" the decertification

petition, and following HK Baugh's intervention in this dispute—Crystal Clear moved for a preliminary injunction.

Both Franke and Kuo testified at the preliminary injunction hearing. Franke's testimony concerned Crystal Clear's infrastructural capabilities; she testified that Crystal Clear has two "active meters" on River Bend Ranch and that the property's "first 450 LUEs can be served by Crystal Clear before any off-site infrastructure improvements are needed." According to Franke, fulfilling HK Baugh's total service request—1800 LUEs—"could take 18 to 24 months at the longest, based on building a tank." Kuo's testimony focused on the "$25 million . . . delta between securing water through the City of San Marcos versus securing water through [Crystal Clear]." According to Kuo, obtaining water from the City of San Marcos would not require any "off-site infrastructure expense because the water lines that would be utilized to service the property [are] on the boundary of the property . . . it's already there." Kuo testified that, comparing both service providers, "the difference" in HK Baugh's infrastructural expenses would be "zero for the City of San Marcos and $7.2 million [f]or Crystal Clear." Moreover, Kuo testified that "[t]here is potentially a $17 million water acquisition fee for [Crystal Clear]. . . . And then, lastly, [a potentially increased] water impact fee."

The district court issued a preliminary injunction enjoining the PUC from granting HK Baugh's petition for expedited release or otherwise curtailing Crystal Clear's CCN in the pending proceedings. Applying the "physical ability" test announced in *Green Valley*, the district court first held that Crystal Clear was likely "entitled to the protections of § 1926(b)" because "it has adequate facilities to provide service to [River Bend Ranch] within a reasonable time after a request for service is made and has the legal right to provide service given its CCN." The district court "ma[de] this

determination after considering that no construction has yet begun on the property at issue."

From there, the district court held that "Crystal Clear is likely to succeed on the merits of its preemption claim" due to "the overlap and inconsistencies with the state and federal statutes." But in place of a preemption analysis identifying any specific obstacles or irreconcilabilities, the district court simply stated that "if a statute is expressly preempted, a finding with regard to the likelihood of success fulfills the remaining preliminary injunction requirements." Indeed, the district court's resolution of each preliminary injunction factor hinged on this single premise—that § 1926(b) likely expressly preempts Texas Water Code § 13.2541.

In its capacity as an intervenor, HK Baugh timely appealed the district court's order. The PUC did not appeal the district's court order or file a brief in connection with HK Baugh's appeal.

II

HK Baugh appeals from the district court's grant of a preliminary injunction enjoining the PUC from decertifying River Bend Ranch or otherwise "curtailing" the CCN at issue in this dispute.

To obtain a preliminary injunction, the movant must demonstrate "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017) (per curiam). "We review a district court's decision to grant a preliminary injunction for abuse of discretion." *Miller v. Nelson*, 116 F.4th 373, 379 (5th Cir. 2024). However, "the district court's findings of fact are reviewed for clear error, and conclusions of law are reviewed *de novo*." *Id.*

## A

### 1

The district court first held that Crystal Clear was likely to meet *Green Valley*'s "physical ability" test.

Under § 1926(b), "[t]he service provided or made available through [Crystal Clear] shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body . . . ." In *Green Valley*, our en banc court "consider[ed] the meaning of 'provided or made available' in § 1926(b)." 969 F.3d at 465. Adopting the "physical ability" test, we "determined that the protection provided by § 1926(b) applies only when a loan recipient can show that it 'has (1) adequate facilities to provide service to the relevant area within a reasonable time after a request for service is made and (2) the legal right to provide service.'" *Dobbin*, 108 F.4th at 323 (quoting *Green Valley*, 969 F.3d at 465).

Because Crystal Clear's CCN encompasses River Bend Ranch, only *Green Valley*'s first prong is at issue. As we explained in *Green Valley*, Crystal Clear cannot satisfy this prong without "nearby infrastructure" capable of supplying water to River Bend Ranch. 969 F.3d at 477. This requirement has sometimes been termed "pipes in the ground." *See id.* at 476. "But 'pipes in the ground' is a colloquial shorthand, *not* a strict requirement." *Id.* at 477 (emphasis added). In other words, "[n]o water or sewer utility can make service immediately available to rural, undeveloped land; providing such service involves building or installing facilities, which necessarily takes time to accomplish." *Id.* at n.38. Through this careful qualification, the *Green Valley* test attempts to balance "fidelity to § 1926(b)'s text and recognition of the realities of making water or sewer service available." *Id.* at 477.

2

No error is apparent in the district court's holding that Crystal Clear will likely satisfy *Green Valley*'s "physical ability" test.

For one, Crystal Clear's existing infrastructure is proximate to River Bend Ranch. At the preliminary injunction hearing, Franke testified that Crystal Clear has two "active meters" on River Bend Ranch, a statement substantiated by her affidavit, where she avers that Crystal Clear "owns and operates water pipes in the ground within and adjacent to [River Bend Ranch]." As further proof of nearby infrastructure, Crystal Clear presented a map depicting its "existing facilities located adjacent to and within [River Bend Ranch]."

Just as importantly, the record is likely to show that Crystal Clear's nearby infrastructure can supply water to River Bend Ranch within a reasonable time. Specifically, Franke testified to the accuracy of M&S Engineering's final report, which stated that the "first 450 LUEs can be served by Crystal Clear before any off-site infrastructure improvements are needed." True, Franke also testified that fulfilling HK Baugh's total request of 1800 LUEs "could take 18 to 24 months" due to construction. But HK Baugh has not shown that this amounts to an *unreasonable* length of time to respond to a request for service. After all, water "[s]ervice may be 'available' even if it cannot be immediately used." *Green Valley*, 969 F.3d at 477 n.38. And "what makes . . . a time lag 'reasonable' will likely depend on the facts and circumstances surrounding the particular request for service." *Id.* at 477 n.35. Here, River Bend Ranch remains undeveloped and HK Baugh's request necessitates new infrastructure. *See id.* at 477 n.38 ("No water or sewer utility can make service immediately available to rural, undeveloped land; providing such service involves building or installing facilities, which necessarily takes time to accomplish.").

HK Baugh's arguments to the contrary fail.  First, HK Baugh asks this court to interpret the "reasonableness" of Crystal Clear's delay with reference to January 2019, the month the NSSA came into effect.  According to HK Baugh, a seven-year delay—which accounts for eighteen to twenty-four months of construction—"is simply too long to be 'reasonable' under any interpretation of that term."  However, starting the clock in January 2019 would ignore that HK Baugh altered the original service request multiple times, over many years, resulting in *different* infrastructural requirements as both the project and Crystal Clear's water supply changed.  More crucially, Franke testified that HK Baugh *never* gave Crystal Clear the "green light" to proceed in accordance with *any* of M&S Engineering's reports.  So, to the extent HK Baugh regrets a seven-year delay, it is largely self-created.  *Cf. Deer Creek Water Corp. v. City of Okla. City*, 82 F.4th 972, 983 (10th Cir. 2023) ("[The federally indebted water provider] agreed to provide water service and showed that it had the capacity to do so, but it never agreed to finance or construct the infrastructure.  And although there has been a delay in implementing the improvements necessary for [the provider's] water service to the development, that delay is the result of this litigation, not [the provider's] inaction after agreeing to take necessary steps.").

Next, HK Baugh faults the district court for "disregard[ing] the enormous costs [Crystal Clear] would impose as a condition of service."  Relying on out-of-circuit caselaw, HK Baugh contends that the higher costs requested by Crystal Clear, as compared with the City of San Marcos, amount to "a constructive denial of service."  True, the Eighth and Tenth Circuits will consider excessive costs when assessing whether a service has been "made available" under § 1926(b).  *See Pub. Water Supply Dist. No. 3 v. City of Lebanon*, 605 F.3d 511, 522 n.11 (8th Cir. 2010) ("[A] rural district has not 'made service available' if the rural district's method of providing service amounts to a constructive denial of service.  For instance . . . providing

unreasonably costly or delayed service ... might amount to such a constructive denial of service."); *Rural Water Dist. No. 1 v. City of Wilson*, 243 F.3d 1263, 1271 (10th Cir. 2001) ("[T]he cost of [a district's water] services may be so excessive that it has not made those services 'available' under § 1926(b). . . . There is some point at which costs become so high that assessing them upon the user constitutes a practical deprivation of service.").

Our court has yet to confirm whether the "physical ability" test contains an excessive-cost component. In *Green Valley*, our en banc court replaced the state-law-duty rule announced in *North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910 (5th Cir. 1996) (per curiam), *overruled by Green Valley*, 969 F.3d 460, with a modified version of the Sixth Circuit's "physical ability" test, as articulated in *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 705–07 (6th Cir. 2003). *Green Valley*'s formulation of the "physical ability" test is silent as to cost. Even if excessive costs can keep service from being "available" under § 1926(b), which we do not decide one way or the other, the reasonableness of costs under the circumstances would present a fact-dependent question best suited for initial determination by the district court. *Cf. Green Valley*, 969 F.3d at 477 n.35 ("[W]hat makes facilities 'adequate' or a time lag 'reasonable' will likely depend on the facts and circumstances surrounding the particular request for service.").

For the foregoing reasons, we discern no error in the district court's determination that Crystal Clear will likely satisfy *Green Valley*'s "physical ability" test. Through its CCN, Crystal Clear enjoys a legal right to serve River Bend Ranch. The district court's determination that Crystal Clear could provide such service within a reasonable time after HK Baugh's request was not an abuse of discretion nor did it rely on clearly erroneous findings. However, because we remand on other grounds as discussed *infra*, we sustain only the district court's conclusions as to "physical ability" and

No. 23-50928

do not foreclose inquiry into whether Crystal Clear's services are priced so excessively as to negate "availab[ility]" under § 1926(b).

B

We now consider the second, two-part merits issue—whether Crystal Clear is entitled to the protections of § 1926(b) in its suit against the PUC and, interrelatedly, whether § 1926(b) preempts Texas Water Code § 13.2541.

1

"All preemption has a constitutional source: the Supremacy Clause." *Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*, 134 F.4th 326, 328 (5th Cir. 2025) (citing *City of Phila. v. New Jersey*, 430 U.S. 141, 142 (1977) (per curiam)). "The doctrine of federal preemption that arises out of the Supremacy Clause requires that 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Aldridge v. Miss. Dep't of Corr.*, 990 F.3d 868, 874 (5th Cir. 2021) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)).

"Supreme Court precedent establishes a preemption taxonomy." *Zyla*, 134 F.4th at 328. "[E]xpress preemption occurs when Congress 'adopts express language defining the existence and scope of pre-emption.'" *Est. of Miranda v. Navistar, Inc.*, 23 F.4th 500, 504 (5th Cir. 2022) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 109 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). "Congress may also preempt state law implicitly by either 'directly conflicting with it' (conflict preemption) or by 'occupying a field so pervasively as to naturally exclude it' (field preemption)." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010) (quoting *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007)). "Conflict preemption applies (1) where complying with both federal law and state law

is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013)). And field preemption applies "where state law intrudes in an area that Congress has reserved for federal jurisdiction . . . ." *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72 (1990)).

"In determining the nature and reach of federal preemption, Congress's intent is the 'ultimate touchstone.'" *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Regardless, our "[p]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).

2

According to HK Baugh, Crystal Clear cannot deploy § 1926(b) against the PUC—a state regulatory body—without violating Texas's historic police power over domestic utilities. Crystal Clear, for its part, rejects the contention that § 1926(b)'s protections are inert as against the PUC and argues that "requiring the PUC Officials to comply with federal law in their decertification decisions is not commandeering . . . . [S]tate agencies must comply with federal law . . . ."

In two sentences, the district court embraced a version of Crystal Clear's argument, holding that it "is likely to succeed on the merits of its preemption claim" due to (unspecified, unexamined) "overlap and inconsistencies with the state and federal statutes." In turn, the district court

asserted that, "if a statute is *expressly* preempted, a finding with regard to the likelihood of success fulfills the remaining preliminary injunction requirements." (emphasis added).

The district court's core premise—that § 1926(b) *expressly* preempts Texas Water Code § 13.2541—is mistaken. The federal statute at issue, implicating the traditional state law field of water regulation, does not contain language expressly displacing state law. *See Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023) ("A federal statute expressly preempts a state law when Congress 'adopts express language defining the existence and scope of preemption.'" (quoting *Navistar*, 23 F.4th at 504)); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 203 (1983) ("It is well established that within Constitutional limits Congress may preempt state authority by so stating in *express* terms." (emphasis added)); *Gade*, 505 U.S. at 98 ("Absent *explicit pre-emptive language*, we have recognized at least two types of implied pre-emption: field pre-emption . . . and conflict pre-emption . . . ." (emphasis added)).[7] The district court's legal error infects its grant of a preliminary injunction. To decide the remaining factors, the district court relied on its initial, mistaken classification and nothing more.

Despite receiving some briefing on the issue, we decline to consider, in the first instance, whether conflict preemption otherwise applies to § 13.2541. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77 (2015) ("But even where, as here, a statute does not refer expressly to pre-emption,

---

[7] Tellingly, Crystal Clear never pressed *express* preemption below and instead argued that "requiring the PUC Officials to comply with federal law in their decertification decisions" presented "'a simple case of conflict preemption.'" Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. at 7, No. 1:23-cv-00878 (W.D. Tex. Aug. 29, 2023) (quoting *Crystal Clear Special Util. Dist. v. Marquez*, 316 F. Supp. 3d 965, 977 (W.D. Tex. 2018)).

Congress may implicitly pre-empt a state law, rule, or other state action. It may do so either through 'field' pre-emption or 'conflict' pre-emption." (citation omitted)). Admittedly, there is "something to be said of the judicial economy and efficiency lost by not forging ahead and providing the parties the swift resolution they seek." *Utah v. Su*, 109 F.4th 313, 321 (5th Cir. 2024). Here, however, there is also good reason to pause. Decades ago, in *North Alamo*, we recognized that an injunction "purporting to control the actions of the [PUC], a state regulatory body, would create a . . . difficult federalism question: Namely, does § 1926(b) also preclude a state regulatory agency from modifying the service area of a federally indebted utility." 90 F.3d at 917 n.27. We left that "difficult" question unanswered in *North Alamo* and likewise, in *Green Valley*, "we decline[d] to consider . . . the PUC Officials' contentions that § 1926(b) governs only *local* regulation." 969 F.3d at 478 n.39 (emphasis added). Although this important, unresolved issue appears to be presented, we are hampered by the lack of any, much less correct, conflict-preemption analysis from the district court other than its discernment of "inconsistencies." *See, e.g.*, *DeCanas v. Bica*, 424 U.S. 351, 363–65 (1976) (remanding for "deci[sion] in the first instance" as to "whether and to what extent, [the state statute] as construed would conflict with the INA or other federal laws or regulations" (internal cross-reference omitted)), *superseded by statute as recognized in Arizona v. United States*, 567 U.S. 387, 404 (2012); *cf. Su*, 109 F.4th at 320 ("Without the benefit of the considered judgment of our esteemed colleagues on the district courts, we would arguably be no better positioned to answer the questions presented by the parties' dispute . . . .") (citation omitted).[8]

---

[8] In addition to the district court's analysis, inviting the views of informed and critical stakeholders, such as the Texas Attorney General, the PUC, and the United States Department of Agriculture, may be contributory. *Cf. Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 957 (5th Cir. 2024) ("[R]ather than decide these heady questions ourselves

No. 23-50928

Accordingly, we REMAND this case to the district court for the initial purpose of determining whether 7 U.S.C. § 1926(b) conflict-preempts Texas Water Code § 13.2541. In light of our holding that § 13.2541 is not *expressly* preempted, the district court is further instructed to reconsider its analysis of the preliminary injunction factors, as appropriate. *Cf. Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 469 (5th Cir. 2003) ("[R]emand[ing] for the district court to apply the other three factors governing preliminary injunctions" after it erred in its analysis of the likelihood of success on the merits). In this particular area of law, our precedent indicates that failing to preserve the status quo during remand may risk mooting Crystal Clear's suit. *See Dobbin*, 108 F.4th at 327 ("After the properties' release, the only way Dobbin could obtain real relief against the PUC (and prevent its competitors, MUD 180 and the City of Montgomery, from providing service within its former CCN) is through a ruling that invalidates the PUC's two decertification orders. But Dobbin has not sought such relief, because the invalidation of a final agency order is inherently retrospective and, thus, impermissible under [*Ex parte Young*, 209 U.S. 123 (1908)]."); *Green Valley*, 969 F.3d at 472 n.21 ("[L]eav[ing] for another day" whether an injunction requiring the PUC to recertify a decertified property is "impermissible" under *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n.11 (1949)).[9] So, "[t]o ensure relative stability," the preliminary

---

without the benefit of any considered judgment below or any meaningful response from the Government on appeal, we think it prudent for the district court to consider these arguments in the first instance. Once it does, we will be better positioned to weigh in on issues that affect not only the parties to this case, but evidently so many of the interested stakeholders in this circuit . . . ."), *rev'd on other grounds*, 606 U.S. _____ (2025).

[9] Because jurisdictional impediments have been outcome-determinative in this area of law, aligning today's decision with *Green Valley* and *Dobbin* is vital. In *Green Valley*, the federally indebted provider "ask[ed] us to prohibit the PUC Officials from taking two actions going forward: (1) decertifying Green Valley's service territory and (2) allowing another utility to serve any area decertified from Green Valley's territory." 969 F.3d at

23

injunction enjoining the PUC from decertifying River Bend Ranch or otherwise curtailing the CCN at issue shall remain in place. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (maintaining motions panel's preliminary injunction pending appeal while district court reconsidered the preliminary injunction factors on remand).

\* \* \*

In sum, we find no error in the district court's conclusion that Crystal Clear would likely satisfy *Green Valley*'s "physical ability" test. However, the district court mistakenly concluded that § 1926(b) is likely to *expressly* preempt Texas Water Code § 13.2541. Because conflict-preemption analysis may confirm that we face an unanswered but important question of law, we REMAND this case to the district court so that it can determine, in the first instance, whether § 1926(b) otherwise preempts Texas Water Code § 13.2541 and, relatedly, so that it may assess all relevant preliminary injunction factors as necessary. The preliminary injunction shall remain in

---

472–73. Resolving this "close question[,]" we held that "relief, if awarded, would redress an ongoing violation of Green Valley's rights under § 1926(b)—curtailment of territory where Green Valley maintains it provided service or made it available[.]" *Id.* Later, in *Dobbin*, we held that a federally indebted provider *could not* pursue the injunctive relief sought against the PUC *after* decertification because, "once the PUC has granted a petition for release, as it did here, there is no further action or enforcement for the PUC to take." 108 F.4th at 326. At that stage, "[a]fter the properties' release, the only way Dobbin could obtain real relief against the PUC (and prevent its competitors . . . from providing service within its former CCN) is through a ruling that invalidates the PUC's two decertification orders." *Id.* at 327. However, even though "[t]o the extent that a local or state action encroaches upon the services provided by a protected water association, the local or state act is invalid," *see Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 715 (10th Cir. 2004), *Dobbin* held that affirmatively ordering the PUC to invalidate its own orders was "inherently retrospective and, thus, impermissible under *Young*." 108 F.4th at 327. In this way, *Dobbin* offers a lesson in timing, indicating that a federally indebted provider's § 1926 suit against the PUC must precede a decertification ruling, lest redressability is lost due to an impermissibly retroactive remedy.

No. 23-50928

place; the parties need not file a new notice of appeal; and the clerk of the district court need only supplement the appellate record with copies of the new filings below and the district court's opinion. The panel retains jurisdiction over this limited remand.